## FAY & UX. v. PARKER.

In a civil action founded upon a tort, punishable by the criminal law, an amount of damages equal to the full compensation of the plaintiff for the injury sustained by him cannot be increased by the addition of a fine for the punishment of the defendant.

Whether, in any civil action, the plaintiff may recover exemplary, punitory, or vindictive damages, *quœre.*

TRESPASS, by Robert C. Fay & wife against O. A. Parker, for an assault and battery upon Mrs. Fay.  Verdict for the plaintiffs, and motion of the defendant to set it aside.

The court instructed the jury, that, if they found the defendant guilty, they should find the actual damages, which would include compensation for all injury to the feelings as well as to the person of Mrs. Fay—compensation for her mental as well as her physical sufferings, caused by the assault; that, if the assault was accompanied by any act or word of indecency, outrage, insult, or indignity, which injured her feelings, compensation therefor should be included in the actual damages ; and that they might also give exemplary damages which would be punitive and not compensatory, if they thought it a case in which an example ought to be made for the protection of the public.   To these instructions the defendant excepted.

The jury found a verdict for the plaintiffs, and assessed the actual damages at $150, and the exemplary damages at $331.67.

*Duncan* and *Blaisdell* for the plaintiffs.

*C. W. & E. D. Rand* and *Young* for the defendant.

The case was decided March, 1873, by SARGENT, C. J., FOSTER, DOE, LADD, and SMITH, J. J.   HIBBARD, J., not having heard the arguments in the case, took no part in the decision.

FOSTER, J.   A synonym of *damage* (when applied to a person sustaining an injury) is *loss.*   Loss is the generic term.   Damage is a species of loss. •  Loss signifies the act of losing, or the thing lost.   Damage— in French, *dommage;* Latin, *damnum,* from *demo,* to take away—signifies the thing taken away,—the lost thing, which a party is entitled to have restored to him so that he may be made *whole* again.

Damage, we remarked, is derived from *demo*, to take away; and therefore it is not derived from *punio*, to punish.

When used to signify the money which a plaintiff ought to recover, damage is never, nor in any sense, synonymous with nor collateral to the terms example, fine, penalty, punishment, revenge, discipline, or chastisement.

Loss or damage sustained—the thing taken away—may be supplied by compensation; but the loss, damage, or thing taken away cannot be supplied or restored by the vindictive punishment of him who has occasioned the loss or damage.

It is just as easy to call things by their right names as by wrong names, and it is better to be correct than careless in our speech.

The defendant's exception presents the question whether punitive damages (so called, by a perversion of language and ideas so ancient and so common as seldom to attract attention), that is to say, damages in the nature of, and intended as, a penalty or punishment,—and exemplary damages, that is to say (if people will persist in saying it), damages in the nature of, and intended as, an example for the protection of the public against offences similar to that for which such damages are awarded (inflicted), may be given to the plaintiff in a civil action resulting from an act for which the defendant may be indicted and punished by force of the criminal law.

In considering this question, we must regard the terms exemplary, vindictive, and punitive or punitory, as meaning the same thing; such being, doubtless, the acceptation of the language of the courts generally in cases where these terms are employed with reference to damages in a civil action.

In so far as the settlement of this question depends upon the weight of authority, it will be appropriate and convenient to direct our attention, in the first place, to those decisions of the courts of this state wherein the subject of exemplary, vindictive, or punitive damages has been considered. The most prominent cases of this character are twenty in number. We will refer to them in chronological order.

I. *Sanborn* v. *Neilson*, 4 N. H. 501, A. D. 1828. This was an action for criminal conversation with the plaintiff's wife,—an offence then punishable by fine, imprisonment, and whipping, not exceeding thirty stripes. Act of Feb. 15, 1791.

Upon the trial, the jury were instructed that "if they found for the plaintiff, he was entitled to recover damages to the extent of the injury sustained; that the grounds on which damages were to be given were wounded feelings, disgrace, the loss of the assistance and society of the wife, and the introduction of spurious children into his family to be by him maintained; and that in estimating the damages, they should look not only to the character and conduct of the plaintiff and his wife to see what such a husband ought to recover for criminal conversation with such a wife, but to the conduct of the defendant, in order to determine what a person who had conducted as he had done ought to pay."

"RICHARDSON, C. J." "After an attentive examination of the subject, we see nothing in those directions which we think ought to have been otherwise."

It does not appear very clearly what the court did see in those instructions. If it is to be understood that the jury were empowered to give damages beyond compensation, and purely as a punishment, the case would sustain the position of the plaintiffs here; otherwise, not. But when taken in view of the context, we fail to see any purpose on the part of the presiding judge to give the words such meaning. The jury were instructed to look to "the character and conduct of the plaintiff and his wife to see what such a husband ought to recover, and to the conduct of the defendant, in order to determine what a person who had so conducted ought to pay."

There is no suggestion of payment, otherwise than as compensation for the wounded feelings, disgrace, &c., which the husband has sustained. Nothing is said about vindictive, exemplary, or punitive damages; and the authority of Bul. N. P. 27, referred to by the very learned chief justice in support of the approval by the court of these instructions, contains no reference to any damages in such a case other than such as may well be regarded as strictly compensatory.

*Sanborn* v. *Neilson* is frequently cited by the courts and text-writers who oppose the doctrine of punitive damages in cases subject to the criminal law.

II. In *Whipple* v. *Walpole*, 10 N. H. 130, A. D. 1839, the court recognize the principal of punitory damages in torts aggravated by malicious conduct, and apply it to the case of negligence on the part of a town relative to the repair of its highways. The only cases cited by WILCOX, J., are *Huckle* v. *Money*, 2 Wils. 205, *Tullidge* v. *Wade*, 3 Wils. 18, and *Tillotson* v. *Cheetham*, 3 Johns. 56.

Concerning these three cases, very often cited in the books as authority for the position assumed here by the plaintiffs, it may be confidently asserted that only the most superficial examination would account for the use of those cases, or either of them, for any such purpose. They are all substantially alike in principle. In each of them, the injuries inflicted were such as to call for damages of a compensatory character purely, but aggravated by the peculiar circumstances of the parties and the occasion; and in the latter, the ground of damages is expressly limited to the degree of injury to the plaintiff in his private feelings and his official character.

It would be somewhat difficult to gather up the fragments of this exploded case,— *Whipple v. Walpole*. As an authority for the application of the doctrine of punitive or exemplary damages to the case of towns and highways, it is expressly overruled in the recent case of *Woodman* v. *Nottingham*, 49 N. H. 387.

III. *Chesley* v. *Chesley*, 10 N. H. 327, A. D. 1839 :—

IV. *Greenleaf* v. *McColley*, 14 N. H. 303, A. D. 1843, were assump-

sit founded on a breach of promise of marriage.  Both cases exhibited gross insult on the part of the defendant, and other "circumstances of aggravation and contumely."  The subject of exemplary or punitive damages was not suggested, but the circumstances of the defendant's conduct were recognized as tending to aggravate the damages which the plaintiff had sustained.

V.  *Merrill* v. *Peaslee*, 17 N. H. 540, A. D. 1845, was case for slander. GILCHRIST, J., said that evidence of actionable words, not stated in the declaration, may be admitted to show the malice of the defendant. " Undoubtedly, damages could not, in strictness, be given for these words; but, as the malice was a material part of the plaintiff's case, it would be absurd to say that the *quantum* of damages should not be affected by such evidence, introduced to prove it."

VI.  *Davidson* v. *Goodall*, 18 N. H. 423, A. D. 1846, was case for seduction, and has been cited as an authority in support of exemplary damages, to an extent beyond compensation.

The jury were instructed that if the defendant resorted to fraud and deception to accomplish his purpose, they were not bound to limit the damages to the exact amount of the value of the girl's services, but might assess such further sum as *would compensate* the plaintiff (her cousin and master, *in loco parentis)* for his wounded and mortified feelings occasioned by the act, and such as would *tend to check* the commission of such offences.

In delivering the judgment of the court, GILCHRIST, J., remarks that he is unable to see any sufficient objection to the directions; and adds,— " It is hardly necessary to say that exemplary damages may be given in this action, since such damages are the end for which it is ordinarily brought." He refers to the anomalous character of the principle regulating the damages in suits of this character, by which courts and juries have undertaken to render substantial justice, without precise conformity to any clearly scientific rule.

We cannot fail to observe, that while the learned judge applies the term exemplary to the damages which such a case allows, it is, in reality, used as indicating those damages which the betrayed victim sustains in her feelings and for her disgrace; that all the elements of damage are such as come clearly within the boundaries limiting compensatory damages, though " *tending*," indirectly, " to check the commission of such offences."

VII.  *Whitney* v. *Swett*, 22 N. H. 10, A. D. 1850, was trespass *quare clausum*, in which circumstances of abuse of authority, such as to constitute the acts of the defendant, after a lawful entry upon the land, a trespass *ab initio*, and where the question of exemplary damages might well have been raised,—but it was not suggested,—the instruction to the jury, approved by BELL, J., in the opinion of the court, being that the jury should " take the whole case into consideration,

and award to the plaintiff such sum in damages as under the circumstances they thought the defendant ought to pay and the plaintiff ought to receive."

The collocation of words here seems to us to indicate that the court intended to say that what the defendant ought to pay was *that which* the plaintiff ought to receive; and that the transposition of the two terms of this same proposition, in *Sanborn* v. *Neilson*, before cited, does not vary the sense and meaning in that case.

VIII. *Symonds* v. *Carter*, 32 N. H. 458, A. D. 1855, was slander. Words other than those laid in the declaration were admitted as evidence of express malice. FOWLER, J., among other cases in support of the precise point raised by the exception to this evidence, cites *Kinney* v. *Hosea*, 3 Harrington 397, to this proposition,—" if there be evidence of express malice, the jury may give exemplary damages,"—the only instance of the use of that term "exemplary" in the lengthy opinion of the court, or in any of the cases referred to. The damages thus designated are clearly of the same character as those regarded as compensatory merely, in *Merrill* v. *Peaslee*, before cited, and other cases of the same character. They are precisely such damages as are comprehended within the rules laid down in 2 Gr. Ev., secs. 266, 272, and which go in aggravation of the injury itself, which the complaining party has sustained in his feelings by the manifestation of the malice of his adversary.

IX. *Severance* v. *Healey*, 32 N. H. 289, A. D. 1855. Slander. The case is precisely like the preceding case of *Symonds* v. *Carter*. Without alluding in any manner to the question of exemplary damages, evidence of the speaking of other slanders than those laid in the declaration was held admissible as showing malice, and (said the court) the plaintiff was entitled to the benefit of it. The case discloses evidence of such deep malignity, and such circumstances of insult and indignity, as would seem to call loudly for an award of punitive damages, if such were admissible in any case of slander; but with Judge PERLEY, Judge BARTLETT, and JAMES BELL, then of counsel, such a claim was not suggested.

X. *Hopkins* v. *The Railroad*, 36 N. H. 9, A. D. 1857, is clear, to the point that the jury may give exemplary damages where a personal injury has been caused by the gross carelessness of a railroad in the management of its trains.

The question as to the liability of a defendant to pay punitive damages, beyond a compensation, was not raised in the case (the question being whether it could be applied to a corporation in the case of the negligence, merely, of their servants), such a rule being conceded by the defendant's counsel as applicable to cases where the tort is aggravated by fraud, malice, violence, cruelty, or the like circumstances. The court assent to the rule, thus admitted in argument, " regarding it as extremely well settled that exemplary or vindictive damages may

in certain cases be recovered; and this [the opinion goes on to say] is perhaps in accordance with the legislative policy, which has given pecuniary penalties, in numerous instances, to private prosecutors of certain offences.    Where the wrong done to the party partakes of a criminal character, though not punishable as an offence against the state, the public may be said to have an interest that the wrong-doer should be prosecuted and brought to justice on a civil suit; and exemplary damages may in such cases encourage prosecutions, where a mere compensation for the private injury would not repay the trouble and expense of the proceeding.

" It is objected that in this case exemplary damages cannot be recovered because the foundation of the action is negligence, and not a wilful and malicious act of the defendants.    Such damages are awarded for the sake of the public example, or to punish some act or default which has more or less the character of a crime."    " Gross carelessness, where duty to the public requires the utmost care,   *   *   has certainly a strong character of cruelty and moral turpitude."

The *dictum* of this case may well be regarded as expressing the opinion of the distinguished jurist who announced it, in favor of the abstract principle which would allow damages beyond compensation in cases of much aggravation.

But, waiving for the present the consideration of that general and abstract proposition, it need hardly be observed that the case is not an authority for the plaintiffs here,—that being a case, as this is not, where the interests of society could derive no protection from the arm of the criminal law.

It suggests this *quære:* How would it be, if the law provided a punishment by indictment and fine for the same act of negligence in all cases, as in the special case provided for by Gen. Stats., ch. 264, sec. 14 ?

In this case, Judge PERLEY suggests that one reason why exemplary damages should be allowed, is because the public may be said to have an interest that the wrong-doer should be prosecuted and brought to justice on a civil suit; and exemplary damages may in such cases encourage prosecutions, where a mere compensation for the private injury would not repay the trouble and expense of the proceeding.    But, with submission, we remark, that wherever the public interest seems to require the private prosecution of offences against good morals, a sufficient stimulus is afforded by those salutary provisions which give to the prosecutor, as in *qui tam* actions, for instance, a part or all of the penalty which the wrong-doer has incurred.

XI.  *Knight* v. *Foster*, 39 N. H. 576, A. D. 1859.  Slander.  Cushing, for the defendant *arguendo*, says,—" the doctrine in regard to vindictive damages seems to be now in such an unsettled condition as to justify and call for an examination of the authorities."

Such an examination, however, the court declined, disposing of the whole matter in these words and no more : " In case of actual malice,

the jury may award exemplary damages—what the plaintiff ought to receive and the defendant ought to pay—citing only *Symonds* v. *Carter*, *Whipple* v. *Walpole*, and *Hopkins* v. *The Railroad*.

XII. In *Page* v. *Parker*, 40 N. H. 72, Mr. Justice FOWLER speaks of aggravating circumstances of indignity and insult, of abusive language, &c., as tending " to show the whole extent and degree of the injury."

XIII. In *Perkins* v. *Towle*, 43 N. H. 220, A. D. 1861, SARGENT, J., after a review of some of the English cases, to which reference will hereafter be made, concludes the opinion of the court with the remark that the court does not " intend by this decision to *extend* the doctrine of exemplary damages as held in this state, but to hold, simply, that exemplary damages may be recovered in an action of trespass *quare clausum fregit*, as well as in any other action where there are such circumstances of aggravation, of insult, and of malice as would warrant such recovery."

It will be observed, that precisely such damages as are there called exemplary would be included within the term compensatory, as used in the instructions to the jury in the case now before us.

We shall expect to show hereafter, that the English cases cited—viz., *Merest* v. *Harvey*, 5 Taunt. 230, and *Sears* v. *Lyons*, 2 Stark. 317—do not sustain the principle for which their authority is invoked ; and that in those cases (as in the case of *Perkins* v. *Towle*) such damages as are called exemplary, were, or might have been, given on the plain and fair ground of compensation merely.

XIV. *Moore* v. *Bowman*, 47 N. H. 494, A. D. 1867, is a case illustrating forcibly the unsettled and doubtful condition of the law as it is regarded in this state upon the point in question,—the court holding that " an officer who attaches goods is not liable for exemplary damages, simply because he rashly and heedlessly took them without taking due care to learn the rights of the plaintiff."

In the opinion of the court, by BELLOWS, J., no more is said upon the subject than this : " Where the act complained of is malicious or wanton, or is characterized by gross negligence in the defendant, exemplary damages may be awarded according to the decisions in this state ; but we are not aware that they have gone so far as the rule in this case. In *Whipple* v. *Walpole*, 10 N. H. 130, the rule laid down was, that exemplary damages might be awarded where there was gross negligence ; and the rule laid down by Mr. Sedgwick, in his valuable work on Damages, p. 39, is, that exemplary damages may be awarded whenever the elements of fraud, malice, gross negligence, and oppression mingle in the controversy. This rule, however, is questioned in 2 Gr. Ev., sec. 253 and note, where the authorities are extensively reviewed." " Upon the whole," he adds, " we are not disposed to extend the rule which allows exemplary damages to cases where the injurious acts are merely rash and heedless."

XV. *Towle* v. *Blake*, 48 N. H. 92, A. D. 1868. Trespass for an assault

and battery. The head note is,—" In torts involving circumstances of aggravation, and indicating malice, insult, oppression, wanton or wilful violence, the jury may be instructed to give vindictive damages in compensation for the injuries received. The criminal prosecution is no bar to the civil suit at one and the same time."

The court instructed the jury that the defendant would be liable for all the damages to the plaintiff that were the natural and necessary consequences of the violence used by him, including both bodily and mental pain and suffering ; and that to this the jury were at liberty to add a further sum, by way of exemplary damages, such as the defendant ought to pay and the plaintiff to receive.

NESMITH, J., says " that the instructions as to the measure of damages seem to accord with the rules laid down in the elementary books, —that in torts involving circumstances of aggravation, showing malice, insult, oppression, wanton or wilful violence, courts are at liberty to instruct a jury that they may find exemplary damages, such as the plaintiff ought to have and the defendant ought to pay."

Observe, that the rule here laid down is simply an interpretation or explanation of the language used by the court below in the charge to the jury. The instructions are approved as correct ; and then the language above quoted is immediately appended, by way of more elaboration of the same doctrine, and obviously intended to express precisely the same thing.

When, therefore, NESMITH, J., speaking for the court, declares that exemplary damages, in the case then before the court, are such as the plaintiff ought to have and the defendant ought to pay, he means just what the judge at the trial meant when he said, " such as the defendant ought to pay and the plaintiff to receive ;" and we suppose both judges, and those concurring in the opinion, meant that whatever the defendant ought to pay, *that* the plaintiff ought to receive ; not that the plaintiff ought,—by way of full compensation for the malice, insult, oppression, and wanton violence directed against and wounding his feelings, and so operating as a mental injury capable of being satisfied by compensatory damages strictly,—to receive one sum, and then the defendant ought, by way of punishment, to pay another and further sum, which the plaintiff, by way of compensation, ought *not* to receive ; but, in short, that *all* the defendant should pay, under the unnecessary denomination of exemplary damages, were compensatory damages, neither more nor less. Such damages as these are those spoken of by Greenleaf, 2 Ev., sec. 266, when he says,—" It is frequently said, that, in actions *ex delicto*, evidence is admissible in *aggravation* or in *mitigation of damages.* But this, it is conceived, means nothing more than that evidence is admissible of facts and circumstances which go in aggravation or in mitigation of *the injury itself.* The circumstances thus proved ought to be those only which belong to the act complained of. The plaintiff is not justly entitled to receive compensation beyond the extent of his injury, nor ought the defendant to pay to the plaintiff more than the plaintiff is entitled to receive."

And again, sec. 272 : " Where an evil *intent* has *manifested itself* in *acts* and circumstances accompanying the principal transaction, they constitute part of the injury. \* \* And, generally, whenever the wrongful act of the defendant was accompanied by aggravating circumstances of indignity and insult, whether in the time, place, or manner, though they may not form a separate ground of action, yet, being properly alleged, they may be given in evidence to show the whole extent and degree of the injury."

Such damages are the same referred to by Chancellor KENT, where he speaks of the jury being at liberty to award damages " with a liberal hand ; " or, as Lord ABINGER said, in 1 Mees. & W. 342, that the jury, in regarding the wanton and oppressive conduct of the defendant, " should not be sparing in the damages."

Our court did *not* mean, any more than these distinguished jurists did, that when the defendant was made to pay such damages " as the defendant ought to pay *and* the plaintiff ought to receive," the plaintiff *ought* to receive, or the defendant ought to pay *to him*, a mere fine, any more than to any other citizen, or to the affronted dignity of the state.

If our court *did* mean otherwise, the language adopted to express the doctrine was extremely unfortunate ; for the court, after expressing approval of the instructions of the jury in the manner alluded to, proceed as follows : " Where the conduct of the defendant clearly evinces motives and acts of a wanton, or of an excessive, violent, malicious, or evil nature, we think the jury may give, as *compensatory* damages, what are *usually denominated* vindictive damages."

This principle, in the form of language thus chosen to express it, is not modified by the impartial review which follows, of the contradictory views of Prof. Greenleaf and Mr. Sedgwick upon this subject, concerning which the organ of the court is careful to express no preference, by way of approbation or dissent.

In dismissing the further consideration of *Towle* v. *Blake*, it must be remarked that the instructions to the jury in the present case,—namely, that they might give, by way of compensation, such damages as resulted from the indecency, outrage, insult, or indignity which injured Mrs. Fay's feelings,—are sustained by the authority of *Towle* v. *Blake*.

It is equally clear that the further instructions,—namely, that they might also give exemplary damages which would be punitive and not compensatory, if they thought it a case in which an example ought to be made for the protection of the public,—derive no support from the authority of *Towle* v. *Blake*.

XVI. *Cram* v. *Hadley*, 48 N. H. 191, A. D. 1868, was trespass *quare clausum*, and, in the circumstances, was not a case where exemplary damages, in any view, could be claimed. All that is said upon the subject is contained in this language of SARGENT, J. : " It is only where the elements of fraud, malice, gross negligence, or oppression mingle in the controversy, that exemplary damages are to be given."

XII. *Taylor* v. *The Grand Trunk Railway*, 48 N. H. 303, A. D. 1869. This case contains a somewhat lengthy review of the authorities upon the subject of exemplary damages; not, of course, of the majority of them, which would be impossible, so numerous have they become, nor, indeed, of some of the most prominent cases.

To some of those referred to in support of the views there expressed, as well as to others not mentioned, reference will be made hereafter. The works of the text-writers, Greenleaf, Sedgwick, Metcalf, and Kent, are also considered, and a preference expressed for the opinions and conclusions of Mr. Sedgwick.

The substance of the decision is a full endorsement of the doctrine of exemplary or punitive damages, over, above, and beyond compensation, in cases of malicious tort or gross negligence.

The opinion by BELLOWS, J., contains *dicta* expressing concurrence in the doctrine that such damages are not imcompatible with the infliction of punishment, at the same time, by fine, under criminal procedure.

XVIII. *Holyoke* v. *The Grand Trunk Railway*, 48 N. H. 541, A. D. 1869. NESMITH, J. " Plaintiff is to have a reasonable satisfaction for actual suffering of both body and mind. Also exemplary damages may sometimes be recovered in this form of action, embracing cases of gross negligence."

XIX. *Belknap* v. *Boston & Me. R. R.*, 49 N. H. 358, A. D. 1870. Trespass for an assault, and ejecting the plaintiff from the defendants' cars. The court dispose of the question of damages by expressing the language of Mr. Sedgwick (Damages, sec. 38) : " When either of these elements [*i. e.*, fraud, malice, gross negligence, or oppression] mingles in the controversy, the law, instead of adhering to the system, or even the language, of compensation, adopts a wholly different rule, and permits the jury to give what it terms punitory, vindictive, or exemplary damages ; in other words, blends together the interests of society and of the aggrieved individual, and gives damages, not only to recompense the sufferer, but to punish the offender."

All these remarks were wholly unnecessary to the decision of the question before the court. It was sufficient to say, as the court did, that none of the supposed elements of exemplary damages existed in the case.

The remarks, however, none the less indicate the view entertained, by the author of the opinion, upon this subject. It will nevertheless be observed, that all the elements of damage referred to are such as are taken into consideration in estimating purely compensatory damages. The precise point raised by the present inquiry did not arise there, since the offence charged upon the corporation was not the subject of an indictment.

XX. *Woodman* v. *Nottingham*, 49 N. H. 387, A. D. 1870, was *case*

against a town to recover damages for injuries received in consequence of a defective highway.

The point decided was, that the statute regulating this subject does not contemplate exemplary or vindictive damages to the suffering party.

But, if the common law contemplates such damages in the case of corporations guilty of gross negligence, it is not quite easy to see *why* the statute, which has no expression upon the subject, does not contemplate such damages, unless it be that an indictment will lie against the town for the negligence resulting in the defective highway.

As being the latest decision in our state in which the question of exemplary damages is considered, the remarks of the court upon the subject possess no little significance. The court, NESMITH, J., say,— " We have interpreted the word *damages* to mean, here, a compensation, recompense, or satisfaction to a party plaintiff for an injury actually received by him from the defendant, and precisely commensurate with the injury, whether it be to his person or estate"—citing 2 Gr. Ev., sec. 253.

The court below instructed the jury that they might give exemplary damages, if, in their judgment, the circumstances warranted it. But the court above said,—" We are aware that exemplary or vindictive damages have, under instructions of the court, been sometimes given by juries in this class of actions against towns. In this state, the case of *Whipple* v. *Walpole*, 10 N. H. 130, is referred to as the leading authority to justify such a verdict. The facts in that case seem to have made out a case of gross negligence, therefore the plaintiff seems to have been entitled to claim a higher *compensation* [the word is italicised] than he would have been entitled to, had the agents of the town exercised more diligence in meeting the just claims of the plaintiff. It appears to us, the true measure of damages should be limited, and measured by the *rule*, to *one full, actual compensation* [italicised] for the injury received; neither more, nor less. Prof. Greenleaf, in his able treatise on this subject, *well remarks*,—' If the plaintiff's injury be aggravated by the criminal act or neglect of the defendant, by evidence of recklessness, insolence, wanton or malicious or oppressive violence, and the like, on the part of the defendant, all such conduct should be properly considered in estimating the plaintiff's *actual* [italicised] damage, and *objects* [italicised] to making up a larger sum in the form of *punitive or vindictive* [italicised] damages. 2 Gr. Ev., note to sec. 253.' "

If this is not a full and square indorsement of Prof. Greenleaf's theory, by the same court which had very recently expressed its disapproval of the same, it would be difficult to find appropriate language with which to signify such indorsement and approval. Between these two cases, *Belknap* v. *The Railroad* and *Woodman* v. *Nottingham*, decided by the same judges *(quorum pars fui)* at the same term of court, there is no conflict concerning the questions required to be decided; but, at the same time, there seems to be no *agreement* between the *dicta* of the learned authors of the respective opinions.

The court, in *Woodman* v. *Nottingham*, cite *Emblem* v. *Myers*, 6 H. & N., to which reference will hereafter be made, as an authority in support of the views expressed.

These, I believe, are all the cases which our own reports afford touching the subject now under consideration.

Is the question now before us legitimately open for consideration at this time, or is the question *settled ?*

Only one case, *Towle* v. *Blake*, raises and decides the precise question here presented, as to the compatibility of the doctrine of two punishments of precisely the same character, at the same time, for the same offence, the one by civil and the other by criminal procedure.

Probably a majority of the cases indicate the view of the courts, that, independent of any considerations concerning the application of the criminal law, exemplary damages may be awarded as punishment and not as compensation, in cases of express fraud, malice, indignity, wantonness, oppression, insult, cruelty, &c.

Not one of these cases, in my view of them, treats of any element of damage such as is called vindictive, punitory, or exemplary, which might not properly be considered in estimating the compensatory damages to which, under such circumstances, everybody concedes the injured party might justly receive.

Not one of them goes so far as to hold that the same elements of damage may be three times considered and damages three times awarded,—once to the plaintiff as a compensation, again to the plaintiff by way of punishing the defendant, and again, by way of fine under the criminal law.

Not one of them goes so far even as to hold that the same elements of damage may be *twice* considered and damages twice awarded,—once to the plaintiff as a compensation for an actual injury sustained, and again to the plaintiff as a punishment of the defendant; because, wherever the elements of exemplary damages are considered, they are invariably regarded and spoken of as something additional to and other than the elements going to make up what is sometimes called *actual* damage.

Not one of them adopts the rule, in words, in spirit, in intention, or in substance, expressed by the instructions in the present case, namely, to this effect, that the jury may consider all the elements which anybody ever claimed could enter into the calculation of exemplary damages, and give such damages to the plaintiff *as compensation*, to be included in the *actual* damages, and then give the plaintiff exemplary damages for the " purpose " of punishment and for the sake of the public example.

Perhaps it would not be erroneous to say that the question has not been thoroughly examined and very carefully considered, but has been suffered to lean upon and sustain itself by the supposed weight of authority, rather than to stand upon principle and inherent strength.

At any rate, in view of the more recent cases, wholly contradictory

and irreconcilable as we have seen them to be (compare *Hopkins* v. *The Railroad*, *Belknap* v. *The Railroad*, and *Taylor* v. *The Railroad*, with *Woodman* v. *Nottingham*, the latest of them all), we are constrained to adopt the language of Judge Cushing in *Symonds* v. *Carter*, and to say, as he said in the year 1859,—"The doctrine in regard to vindictive damages seems to be *now* in such an unsettled condition as to justify and call for an examination of the authorities."

"By damage, we understand every loss or diminution of what is a man's own, occasioned by the fault of another." Ruthf. Inst. B. 1, ch. xxii, sec. 1; Grotius, Lib. II, cap. xxii, 2.

"The definition of damage extends the notion of it beyond a man's goods. His life, his limbs, his liberty, an exemption from pain, his character or reputation, are all of them his own, in a strict and proper sense; so that the loss or diminution of any of them gives him a right to demand reparation from those by whose fault they have been lost or diminished. *Ibid.*

"He who has maimed another does not make him full reparation for the damage sustained, unless he pays for the cure, and gives him, besides such payment, the value of what he has lost by being rendered incapable to earn so much by his labor as he otherwise might have earned if he had not been maimed." Such is Rutherforth's translation of Grotius, Lib. II, cap. xvii, sec. xiv.

But he tells us these particulars, which are all that Grotius mentions, do not include the whole of the damage. And after enumerating several other elements, he continues: "The person who is maimed has a right to freedom from causeless pain; and he who has hurt him has injured him in this right. He may therefore demand *smart money*, or some consideration in amends for the pain which he has unjustly suffered. Now, under this head we may fairly include any blemish which remains after the first smart or pain is over; for, as far as the injured person had a right to be free from such blemishes or from the uneasiness which any deformity will occasion him, he has a right to be paid for having them brought upon him. If the person who has been ill treated should escape without losing his limbs or the use of them,—yet, if he has been wounded, the expense of cure, the loss of time, the pain which he has felt, are all of them damages for which reparation is due. Or, if he has been only beaten, so that there has been no expense of cure and no loss of time, he has still a demand of *smart money*, or of *satisfaction* for the pain that he has felt.

"What has been said concerning maiming, wounds, or blows, will be sufficient to show what sort of amends is due to a man who has been deprived of his liberty by unjust imprisonment. His loss of time is one article in the account, but it is not the only one; the mere uneasiness of such a situation, under which we may include the disgrace attending it, is a damage to him." *Ibid*, sec. 10.

We see here how carefully the idea of damage is limited to reparation and compensation for injury to that which is strictly a man's own;

and the idea of punishment for the pecuniary advantage of the injured party or for public example, to the pecuniary profit of the individual, is as carefully excluded. And it is interesting as well as instructive to observe, that one hundred and twenty years ago the term *smart money* was employed in a manner entirely different from the modern signification which it has obtained, being then used as indicating compensation for the smarts of the injured person, and not, as now, money required by way of punishment, and to make the wrong-doer smart.

Pufendorf discourses thus: "*Lors que le juge donne le choix á la personne volée, ou de recouvier son bien, ou de faire pendre le voleur: car si elle choisit le dernier, elle n'a plus rien à prètendre. Mais comme l'usage des Peines doit être réglé sur l'utilite publique, et non pas sur la passion ou sur la caprice des particuliers ; un juge ne fait pas bien de laisser une telle chose en la disposition de la personne lèzée.*"* Pufendorf, *Le Droit de la Nature et des Gens.*, *Liv.* III, ch. 1, sec. 11.

What are now called exemplary, vindictive, or punitive damages seem to be entirely unknown to the civil law. It is true, that the measure of damages is regulated by the character, quality, and motive of the act from whence the injury proceeds; and the judges, who, under the ordinances of France, "regulate" the damages, take all the circumstances of aggravation or mitigation into account.

In a case of injury resulting from an innocent act, "we ought," says Domat, "to moderate the reparation that is to be made, * * but knavish dealing cuts off all pretensions to any mitigation of the damages."

"Thus, for example, if a creditor causes his debtor to be thrown into jail, when he has no right to use the said constraint, whether it be that his debt does not give him that power, or that the age of his debtor or some other cause does make the said imprisonment to be unjust, and the said debtor is a day laborer or other person who by his labor maintains his family, which, for want of this assistance, suffered likewise other losses, it will depend on the prudence of the judge to regulate a reparation both for the loss of the day's work of this prisoner, and for the other damages, according as the injustice of the said creditor may deserve, upon consideration of the circumstances." 1 Domat's Civil Law, by Strahan, Pt. I, Book III, Tit. V.

But the whole idea running through this measure of damages is reparation and compensation—not punishment. All this is very plainly shown by the examples cited in the same chapter. Tit. V, sec. 2, Art. VIII, and notes.

Thus, again, we are told that the Emperor Justinian, in order to avoid perplexity and difficulty, by a law " reduced all the cases where

---

*Whenever the judge has given to the plundered person his choice whether to recover his goods or to cause the robber to be hung, if he choose the latter he has no further claim. But as the infliction of punishment should be administered with a view to the public good, and not with a view to the passion or caprice of individuals, the judge ought not to leave such a matter to the determination of the injured person.

there happen any damages to two kinds. The one is of those cases where the question is about a certain quantity, or which have their nature fixed and regulated, such as sales and leases; and under this kind he comprehended all contracts. The other kind is, of all the other cases whatsoever, without distinction, whatever might be the cause of the damage.

"As for the cases of the first kind, which have their nature fixed, and where the question is concerning a certain quantity, he established it for a rule that the damages should not exceed the double of the said quantity; and, as to all the other cases where there should happen any damages, he ordered that they should be regulated by the prudence of the judge, according to the estimate of the real damage that was sustained." *Ibid*, Pt. I, Book III, Tit. V, Pl. 1936, 1937.

" Damages," says Prof. Greenleaf, " are given as a compensation, recompense, or satisfaction to the plaintiff, for an injury actually received by him from the defendant. They should be precisely commensurate with the injury ; neither more, nor less; and this, whether it be to his person or estate. All damages must be the result of the injury complained of. It is frequently said that, in actions *ex delicto*, evidence is admissible in aggravation or in mitigation of damages. But this it is conceived means nothing more than that evidence is admissible of facts and circumstances which go in aggravation or in mitigation of the injury itself. The circumstances thus proved ought to be those only which belong to the act complained of. The plaintiff is not justly entitled to receive compensation beyond the extent of his injury, nor ought the defendant to pay to the plaintiff more than the plaintiff is entitled to receive. Injuries to the person or to the reputation consist in the pain inflicted, whether bodily or mental, and in the expenses and loss of property which they occasion. The jury, therefore, in the estimation of damages, are to consider not only the direct expenses incurred by the plaintiff, but the loss of his time, his bodily sufferings, and, if the injury was wilful, his mental agony also ; the injury to his reputation, the circumstances of indignity and contumely under which the wrong was done and the consequent public disgrace to the plaintiff, together with any other circumstances belonging to the wrongful act and tending to the plaintiff's discomfort. And, on the other hand, they are to consider any circumstances of recent and immediate misconduct on the part of the plaintiff, in respect to the same transaction, tending to diminish the degree of injury which, on the whole, is fairly to be attributed to the defendant.

" Where an evil intent has manifested itself in acts and circumstances accompanying the principal transaction, they constitute part of the injury, and, if properly alleged, may be proved like any other facts material to the issue. Thus, in trespass for taking goods, besides proof of their value, the inconvenience and injury occasioned to the plaintiff by taking them away, under the particular circumstances of the case, and the abusive language and conduct of the defendant at the time, are admissible in evidence to the jury, who may give damages accord-

ingly.   And evidence of improper language or conduct of the defend-
ant is also admissible under proper allegations, in an action of trespass
on the case or of trespass *quare clausum fregit*, as constituting part of
the injury.   And, generally, whenever the wrongful act of the defend-
ant was accompanied by aggravating circumstances of indignity and
insult, whether in the time, place, or manner, though they may not
form a separate ground of action, yet, being properly alleged, they may
be given in evidence to show the whole extent and degree of the in-
jury."   2 Gr. Ev., secs. 253, 254, 266, 267, 272.

On the other hand, Mr. Sedgwick lays down the rule in these terms:
" Where the elements of fraud, malice, gross negligence, or oppression
mingle in the controversy, the law, instead of adhering to the system
or even the language of compensation, permits the jury to give what it
terms punitory, vindictive, or exemplary damages; in other words,
blends together the interest of society and of the aggrieved individual,
and gives damages not only to recompense the sufferer, but to punish
the offender."   This rule, he says, seems settled in England and in the
general jurisprudence of this country.   Sedgwick on Damages 34 (5th
ed).   *Ibid*, ch. 18, *passim*.

For a rule that seems settled in England and America, it is quite
remarkable that the learned jurists, who set up and maintain doctrines
diametrically opposite, should be able to present such formidable arrays
of authorities in support of their respective opposing theories as are
exhibited in the celebrated note to sec. 253 of the later editions of Mr.
Greenleaf's book, and the equally voluminous notes to the 18th chap-
ter of Mr. Sedgwick's treatise; and that the one should take comfort
from the assumed support of Judge Metcalf, and that the other
should point triumphantly to Mr. Chancellor Kent as having *decided*
the controversy in his favor.   See Sedg. on Dam. 466*, note.

But what is Chancellor Kent's *decision?*   "It appears to me," he
says, " that the conclusions in Mr. Sedgwick's treatise are well war-
ranted by the decisions, and that the attempt to exclude all considera-
tions of the malice and wickedness and wantonness of the tort, in
estimating *a proper compensation for the victim*, is impracticable, vision-
ary, and repugnant to fine feelings of social sympathy."

It is quite evident that the distinguished chancellor had no reference
to Prof. Greenleaf in these remarks, for the rules laid down by Prof.
Greenleaf would not sanction, but would absolutely forbid such criticism,
and a reference to 1 Kent's Com. 606, note (11th ed.), shows that the
blow is directed against an article in the Boston *Law Reporter* of April,
1847, wherein somebody discoursed as follows : " There would seem to
be no reason why a plaintiff should receive greater damages from a de-
fendant who has intentionally injured him, than from one who has
accidentally injured him, his loss being the same in both cases.   It
better accords, indeed, with our natural feelings, that the defendant
should suffer more in one case than in the other; but points of mere
sensibility and mere casuistry are not allowable to operate in judicial

tribunals; and, if they were so allowed, still it would be difficult to show that a plaintiff ought to receive a compensation beyond his injury. It would be no less difficult, either on principles of law or ethics, to prove that a defendant ought to pay more than the plaintiff ought to receive. It is impracticable to make moral duties and legal obligations, or moral and legal liabilities, coextensive."

What, then, in fact, is the learned chancellor's decision?

We find it in his note to page 15*, vol. 1 (11th ed.), of his Commentaries: "The rule of * * damages * * for a *compensation* for *civil injuries* to the person or property or character, has been recently discussed * * by Theodore Sedgwick, Esq. * * The general rule is, that, if a case be free from fraud, malice, wilful negligence, or oppression, the *compensation* is taken strictly for the *real injury* or *actual pecuniary loss* to the party, and perhaps the natural and legal consequences of the act complained of, and the actual costs and expenses sustained. But, if fraud, malice, and *mala mens* mingle in the controversy, the claim goes beyond *absolute* compensation, and punitive, vindictive, or exemplary damages, by way of punishment and for example's sake, seem to be admitted. * * It follows necessarily that, except in matters of contract, the amount of damages, when bad passions or motives are intermixed, must be left to the sound discretion of a jury. * * But, in cases of loss without aggravation or intentional wrong, the law confines itself to a complete indemnity, without adding exemplary damages, or estimated profits, or remote consequences."

Then he remarks upon remote and consequential damages, and adds, —"In the *Law Reporter* * * there is an article on exemplary damages, endeavoring to show that the decisions do not * * go beyond *compensatory* damages. * * On this subject, it appears to me that the conclusions in Mr. Sedgwick's treatise are well warranted by the decisions, and that the attempt to *exclude* all considerations of the *malice* and *wickedness* and *wantonness* of the tort, in estimating a *proper compensation* to the victim, is impracticable, visionary, and repugnant to just feelings of social sympathy."

This note begins with a reference to "*compensation* for *civil injuries* to *person,* or *property,* or *character.*"

The first natural suggestion upon reading it is the inquiry, How can a sum, assessed as a fine for the violation of the criminal law, for the protection of the public, be a part of a *compensation* to an individual for a civil injury?

It is not possible that so accurate a writer as Kent (if he had considered the point carefully) could have intended to include such a fine in such a compensation; and his whole note, taken together, shows he meant no such thing.

Again: "*Compensation* for *civil injuries* to *person,* or *property,* or *character.*"

An injury to *property* or *character* is totally different from an injury to the *feelings.* The feelings may suffer in consequence of an injury to

person, property, or character ; but when we tell a jury they may give compensation for damage done to person, property, or character, we are not understood to include compensation for mental agony resulting from injury to person, property, or reputation.

The word " person," as used by Mr. Kent, evidently means the *material* person,—the fleshly body, and not the spiritual soul. Injury to person, property, or character, and similar expressions, abound in the books, but they never convey the idea of a direct injury to the mind, or a production of mental suffering. Such suffering may be a consequential damage. But, if A plunges his knife into B and burns his house and accuses him of forgery, and the person and property and reputation of B are injured thereby, such injuries to person, property, and reputation are not spoken of as injuries to the spirit, or soul, or mind. The knife causes pain, but the pain is always taken in the sense of bodily pain only ; and if we have reference to the mental suffering, the sense of disgrace, the wounded honor, &c., we always go on to describe it by other words than " injuries to person, property, and character ;" we do not practically recognize those words as conveying the idea of a mental injury. By usage, no doubt, " injury to the person " might come to mean an injury to the spiritual as well as the physical part of man ; but the phrase has not, in fact, been used in law in that sense.

This analysis was not in the mind of the eminent chancellor when he wrote his note. He did not pause to observe that one class of injuries was omitted in his enumeration, which enumeration is the one commonly used in the books. His attention was not called to the fact that in that enumeration, in the sense of the words as commonly used, one class of cases was omitted. But at the end of his note he breaks forth with indignation against the idea of "excluding all considerations of the malice and wickedness and wantonness of the tort, in estimating a proper *compensation*," " as visionary, and repugnant to just feelings of social sympathy." He begins the note with "*compensation* for civil injuries," and he ends it with " *compensation*." It is *compensation* from beginning to end that he means, and it is *compensation* that he says.

When he says, " if fraud, malice, and *mala mens* mingle in the controversy, the claim goes beyond *absolute* compensation," his meaning is explained by the context to be beyond *absolute* compensation for civil injuries to the person, or property, or character," that is, beyond damage to physical, material things. The claim is for injury to the feelings, an injury omitted in his enumeration of injuries to person, property, and character. It is true that he did not examine the subject thoroughly and critically enough to express himself in this form ; but the whole note taken together is capable of and consistent with this explanation, and is not capable of or consistent with any other.

Finally, the second and third sentences from the end of the note are conclusive. He understands the controversy between Mr. Sedgwick and the writer of the article in the *Law Reporter* to be, whether " all consideration of the malice and wickedness and wantonness of the tort " should be excluded " in estimating a *proper compensation*."

Now, we insist that Mr. Sedgwick has no right to claim that Chancellor Kent has "decided this controversy" in his favor, simply because of (and it all rests upon that) an ebullition of the righteous indignation and the immense disgust of a righteous man and an eminent jurist, in view of the unaccountable and intolerable heresy of the *Law Reporter's* article.

We may not know precisely what the writer in the *Law Reporter did* really mean. Mr. Kent may have misunderstood him. We may not know for a certainty whether he contended for the exclusion of all considerations of malice, wickedness, and wantonness, or whether, in fact, he only meant to contend against punitive damages in a literal sense. In the former sense, Kent understood him, and was led to suppose that the question about punitive damages was, whether all considerations of malice and wantonness should be excluded *in estimating a proper* COMPENSATION. If the question really was (what Kent supposed the writer in the *Law Reporter* claimed it was), whether all considerations of malice and wantonness should be excluded "in estimating *a proper compensation*," I trust this court would agree with Mr. Kent as would everybody who entertains "just feelings of social sympathy."

It is intolerable that the true rule of damages should suffer reproach from such misrepresentations as characterized the article in the *Law Reporter;* and applause should greet the boldness of speech of the eminent chancellor, roused by "just feelings of social sympathy" to protest against a doctrine so repugnant to "social sympathy," that it would be monstrous, if it were not, instead, ridiculous.

If an apology seems to be required for so elaborate a review of Mr. Kent's note, it will be found in the immense importance which is attached to it by one of the combatants in this great controversy. But the advocates of Prof. Greenleaf's doctrine way well claim that the *decision* of the controversy by Mr. Kent is on *their* side and not on the other, and so they may "take pleasure in recording the approbation of an eminent man, * * whose life was one of uninterrupted and useful activity, and whose old age presented one of those beautiful pictures that we are sometimes permitted to behold,—as satisfied in its retrospect as the imperfections of humanity allow, as hopeful of the future as an unwavering confidence in a higher power, and a consciousness of faculties neither wasted nor abused, may warrant." Sedg. on Dam. [466] note.

In a note to p. 38 of his treatise on damages, Mr. Sedgwick concludes that the difference between himself and "the critics" is, after all, little more than a verbal one. So, indeed, it is, if the question be simply whether certain elements of damage are to be regarded as compensatory or exemplary, the plaintiff in either event getting the advantage of them; but it manifestly becomes a matter of more than verbal consequence if the plaintiff is to receive and the defendant to pay for the same elements of injury and damage twice, once as compensatory and again as exemplary; *a fortiori,* it is of more than verbal

consequence if the defendant is required to pay for the same thing the third time, by a fine, for the benefit of the public.

Mr. Mayne, speaking of the admissibility of motive as an element in assessing damages, declares that malice may be shown. "If, then, malice can render an innocent act wrongful, *a fortiori* it must render a wrongful act more wrongful, and therefore be provable in aggravation of damages."

The recognition of this principle seems to him to decide "an important question, viz., whether damages are a compensation or a punishment." In cases of contract, he says, they are only a compensation, and frequently a very inadequate one. In cases of tort to the property, where there are no circumstances of aggravation, they are generally the same. "Where the injury is to the person, or character, or feelings, and the facts disclose fraud, malice, violence, cruelty, or the like, *they operate* as a punishment for the benefit of the community and as a restraint to the transgressor." Mayne on Dam. (2d ed.) 25.

He proceeds with the inquiry whether damages in cases of tort are a compensation or a penalty, and cites Buller's N. P. 27, and *Tullidge* v. *Wade*, 3 Wils. 18, A. D. 1769, to the point that the numberless cases in which damages totally disproportioned to the actual harm inflicted have been given and sanctioned, where the act was of a grossly unconstitutional nature or attended with studied insult, can only be accounted for on the principle that damages in such cases are something more than a payment only for an injury.

Accordingly, he quotes WILMOT, C. J., saying, in *Tullidge* v. *Wade*, —an action for seduction,—"Actions of this sort are brought for example's sake; and, although the plaintiff's loss in this case may not really amount to the value of 20s., yet the jury have done right in giving liberal damages."

Do cases of the character of *Tullidge* v. *Wade* sustain the principle which Mr. Mayne and Mr. Sedgwick deduce from them? Do they not almost invariably disclose circumstances attended with studied insult; such cases as, in modern times at least, are admitted by all courts and jurists to come within the rule authorizing damages for the insult, by way of compensation, "*operating*," indeed, as Mr. Mayne says, "as a punishment"?

Did it occur to Mr. Ch. J. WILMOT that wounded feelings were an element of actual damage, as in later times it is universally allowed to be? or, was the idea of pecuniary compensation for mental sufferings a sentiment etherial, intangible, and too refined for the age in which he lived?

Call them what you may, compensatory in fact, or punitory in their *operation*, if *the same* damages are awarded but once the distinction is merely verbal, and we may well doubt whether the learned chief justice, in recommending the award of damages with a liberal hand, intended anything more or other than we mean, when we tell juries to give the plaintiff what the defendant ought to pay and the plaintiff ought to

receive, in view of the wrong and suffering inflicted by the malice, insult, and indignity exhibited by the circumstances of the case.

Blackstone defines damages as the money " given to a man by a jury as a compensation and satisfaction for some injury sustained ; as for a battery, for imprisonment, for slander, or for trespass." 2 Bl. Com. 438.

" By damage, we understand every loss or diminution of *what is a man's own*, occasioned by the fault of another." 1 Rutherf. Inst., B. I, ch. 17, sec. 1, p. 385.

The learned writer last cited also says,—" As the heirs of the criminal have no claim to such goods as he loses in the way of punishment, so neither has the injured person any, considered merely as the injured person. He has indeed a right to so much of the criminal's goods as will make him amends for the damage which he has suffered ; but no reason can be given why he should have a right to more, unless some positive law has given him such a right. The ends which justify punishment will by no means extend his claim any further than this. The criminal, by suffering in his goods, may be discouraged or prevented from offending again ; but a design to discourage or prevent him from offending again can be no ground for that person, whom he has injured by offending once, to claim property in the goods which he is deprived of. The ends of punishment may be answered by taking the criminal's goods from him ; but these ends do not require that the property which he loses should be vested in the person whom he has injured." 1 Rutherf. Inst., B. I, ch. 18, sec. 14, p. 434.

Mr. Tidd defines *damages* as " a pecuniary compensation for an injury." Tidd's Pr. 870.

The subject and the nature of damages in civil actions are treated of in *Child* v. *Sands*, Carthew 296, and in *Savill* v. *Roberts*, Carthew 416 ; but punitive or exemplary damages are not enumerated among the kinds of damages which are said to be the foundation for an action.

Judge Bouvier, in his law dictionary, Tit. "Vindictive Damages," while admitting that " the current of authorities sets strongly (in numbers, at least) in favor of allowing punitive damages," indicates most clearly his own opposition to the doctrine,—saying, such a " view of the matter is certainly open to the objection that it admits of the infliction of pecuniary punishment to an almost unlimited extent by an irresponsible jury, a view which is theoretically more obnoxious (supposing that there is no practical difference) than that which considers damages merely as a compensation, of the just amount of which the jury may well be held to be proper judges. It would also seem to savor somewhat of judicial legislation in a criminal department, to extend such damages beyond those cases where an injury is committed to the feelings of the innocent plaintiff."

Comyns, treating of " Damages—how assessed," nowhere intimates

a power of assessment beyond or other than as compensation.    3 Com. Dig., Damages E.

Mr. Justice Buller, in all the chapters of his "*Nisi Prius*" on the subject of actions founded upon torts, has no word about exemplary, vindictive, or punitive punishment.

It is impossible to read these chapters (ch. 1 of Slander, 2 of Malicious Prosecution, 3 of Assault and Battery, 4 of False Imprisonment, 5 of Injuries Arising from Negligence, and 6 of Adultery) without the conviction that this eminent judge regarded damages, in all cases, as compensatory merely.

In chapter 3, page 21, he remarks that, by the Jewish constitution, he that hurt his neighbor was responsible on five accounts:

1, For the damages; 2, For the pain; 3, For the cure; 4, For the cessation of work; 5, For the affront or disgrace.

Whatever may have been considered as comprehended under the first head, there is, here, no intimation of anything beyond compensatory damages.

But, if the Jewish constitution had proceeded with the enumeration of elements,—as thus: 6, For an example to others; 7, For punishment by way of fine, *pro bono publico*; and 8, For the same fine, also *pro bono publico*, by criminal procedure,—it would have gone far in advance of the code which prescribed no more than an eye for an eye and a tooth for a tooth, and would have approximated the modern doctrine, as indicated by the instructions to the jury in the case before us.

Again, speaking of adultery, Mr. Justice Buller says,—"As the injury is great, so the damages given are commonly very considerable; but they are properly increased or diminished by the particular circumstances of each case;" but no damages by way of punishment or example are indicated.

Undoubtedly many of the cases, cited and relied upon by Mr. Sedgwick in support of his doctrine, sustain to the fullest extent the position assumed by him (see his text and notes, pp. 515–539); but some of them fall so far short of affording such support, as would seem to indicate a misconception of their true import and meaning.

In this latter category, as it seems to me, must be classed the case of *Tullidge* v. *Wade*, to which I have already sufficiently adverted.

The case of *Huckle* v. *Money*, 2 Wils. 205, A. D. 1763, is subject to the same criticism. "The personal injury done to the plaintiff," said Lord Chief Justice PRATT, afterwards Lord CAMDEN, "was very small,—so that if the jury had been confined by their oath to consider the mere personal injury only, perhaps £20 damages would have been thought damages sufficient;" but the jury who assessed £300 "saw a magistrate over all the king's subjects exercising arbitrary power, violating *magna charta*, and attempting to destroy the liberty of the kingdom,   *   *   endeavoring to support and maintain the legality of the warrant in a tyrannical and severe manner,   *   *   and I think they have done right in giving exemplary damages."

If Lord CAMDEN said no more than this, he said no more, in substance, than that for the outrage and indignity heaped upon the plaintiff by the insolence, oppression, and tyranny of the defendant, a jury might give the plaintiff liberal damages, and such as should *operate* (to use Mr. Mayne's language) by way of example.

In a note commenting upon this case, Mr. Tidd says,—"It may, however, admit of a doubt whether, as the damages are intended merely as a compensation to the plaintiff for the injury he has sustained, they ought in any civil case to be exemplary, or given for the sake of example to other persons." Tidd Pr. 889, note *a*.

Lord Campbell, in his Lives of the Chancellors, Vol. V, p. 207, reports the Lord Chief Justice as having said, in *Beardmore* v. *Carrington*, 2 Wils. 244, "As to the damages, I continue of opinion that the jury are not limited to the injury received. Damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty, and as a proof of the detestation in which the wrongful act is held by the jury."

I do not know what is Lord Campbell's authority for attributing this language to the Lord Chief Justice. It is not to be found in the elaborate report of the opinion by Wilson.

Was it this supposed language of Lord CAMDEN which prompted Lord Campbell, in giving a history of this case, to say,—"The immense popularity which Lord Chief Justice PRATT now acquired, I am afraid, *led him into some intemperance of language*, although his decisions might be sound"? Lives of the Lords Chancellors, Vol. V, p. 249.

But what Lord CAMDEN did say, according to the original and almost contemporary report of Wilson, was very different. The application was, to set aside the verdict for excessive damages. And his lordship said,—"For anything we know, the jury might say ' we will make no difference between the minister who executed and the magistrate who granted this illegal warrant ;' so the court must consider these damages as given against Lord Halifax : and can we say that 1000*l.* are monstrous damages as against him who has granted an illegal warrant to a messenger who enters into a man's house, and prys into all his secret and private affairs, and carries him from his house and business, and imprisons him for six days ? It is an unlawful power, assumed by a great minister of state : can anybody say that a guinea *per diem* is sufficient damages in this extraordinary case, which concerns the liberty of every one of the king's subjects? We cannot say the damages of 1000*l.* are enormous, and therefore the rule to show cause why a new trial should not be granted must be discharged."

Another case of similar character, and much relied upon by the advocates of exemplary damages, is *Merest* v. *Harvey*, 5 Taunt. 442, A. D. 1814, which was trespass *quare clausum*, wherein it appeared that the plaintiff, a gentleman of fortune, was shooting on his own estate, when the defendant, a banker, magistrate, and member of parliament, forced himself on the plaintiff's land, fired at game several times, and used very intemperate language. The jury found a verdict for £500; and,

on motion to set it aside for excess, GIBBS, C. J., said,—" I wish to know, in a case where a man disregards every principle which actuates the conduct of a gentleman, what is to restrain him except damages? To be sure, one can hardly conceive worse conduct than this. What would be said to a person in a low situation in life, who should behave himself in this manner? I do not know upon what principle we can grant a rule in this case, unless we were to lay it down that the jury are not justified in giving more than the absolute pecuniary damage that the plaintiff may sustain. Suppose a gentleman has a paved walk in his paddock, before his window; and that a man intrudes, and walks up and down before the window of his house, and looks in while the owner is at dinner: is the trespasser to be permitted to say, ' Here is a half-penny for you, which is the full extent of all the mischief I have done'? Would that be a compensation? I cannot say that it would be."

Now, that is all that Mr. Chief Justice GIBBS said, in *Merest* v. *Harvey*, about exemplary or punitive damages.

But Mr. Justice HEATH interposed and said,—" I remember a case where the jury gave £500 damages for merely knocking a man's hat off; and the court refused a new trial. There was not one country gentleman in a hundred, who would have behaved with the laudable and dignified coolness which this plaintiff did. It goes to prevent the practice of duelling, if juries are permitted to punish insult by exemplary damages."

Now, notwithstanding the remark of Mr. J. HEATH, which may indeed reflect his view of the propriety of punishment in damages, beyond compensation, I fail to see in this case any element of damage other than such as would fall naturally within the doctrine of compensation for actual injury sustained by the plaintiff from the insult and oppression visited upon him.

*Sears* v. *Lyons*, 2 Stark. N. P. '317, is another of the cases on which Mr. Sedgwick plants his doctrine. This case was trespass for breaking the plaintiff's close, and laying poison upon it with intent to destroy the plaintiff's poultry.

Gurney, for the defendant, contended that the plaintiff was not entitled to recover greater damages than the value of the fowls, and that the jury could not take into consideration the malicious intention conceived by the defendant.

Why not, if the doctrine of exemplary and punitive damages was then so well settled as has been supposed? And this was only a little more than fifty years ago—A. D. 1818.

ABBOTT, J., charged the jury that it had always been held that, in trespass *quare clausum*, a jury might consider not only the mere pecuniary damage sustained by the plaintiff, but also the intention with which the fact had been done, whether for insult or injury; at the same time, he cautioned the jury to guard their feelings against the impression likely to have been made by the defendant's conduct.

Now, it must have been observed, that language similar to that of

Mr. Justice ABBOTT's is well-nigh universal in the English cases of his time, and prior thereto.

What does it mean? Clearly nothing more than to mark a distinction between physical damage, so to speak, very often called actual damage,—an injury to a man's person or to his material property, on the ·one hand, and mental damage, or an injury to spiritual or psychological things, on the other hand. In ancient days, if not in the present, a jury would perhaps regard only the former, unless their attention was directly called to the question whether the plaintiff's feelings were injured by what Mr. Justice ABBOTT called the insult of the defendant's act. Instructions of this character merely authorize the award of damages for an injury done to the plaintiff's feelings by the outrage and insult of the defendant's act, as well as for injury done to his property, or his material person, by the act itself.

Leith v. _Pope_, 2 Wm. Blackstone 1327 _(anno_ 20 Geo. III), was an action for malicious arrest and prosecution of the plaintiff on a charge of horse-stealing.

DeGREY, J., said not a word about vindictive or exemplary damages, _eo nomine;_ but he said this: "Now, the plaintiff is a man of family, a baronet, an officer in the army, and a member of parliament, all of them respectable situations, and which may render _the value of an injury done to him_, especially when directed against his life, adequate to £10,000"—the amount of a verdict which the court refused to set aside for excess of damage.

In an action for debauching the plaintiff's daughter, the jury gave £200 damages. Upon motion to set aside the verdict for excessive damages, Lord ASHURST said,—"The damages are considerable; and, if we had been on the jury, we possibly might have been disposed to have given a smaller sum." _Bennett_ v. _Allcott_, 2 Term 166, A. D. 1787.

There was no suggestion of accounting for the verdict on the ground that the jury had exercised the prerogative of adding exemplary to compensatory damages.

_Pleydell_ v. _The Earl of Dorchester_, 7 Term 529; A. D. 1798, was trespass for diverting a watercourse. Verdict, £3,000. The court set it aside as being excessive and not warranted by the evidence, though they said that, even in a case like the present, which was attended with several circumstances of aggravation, they would not measure the damages which the jury had given in a nice balance.

It did not occur to the court to say, "these circumstances of aggravation warrant exemplary and punitive damages."

And in _Duberley_ v. _Gunning_, 4 Term 651, A. D. 1792, a motion to set aside a verdict of £5000 damages for crim. con. was strenuously resisted by ERSKINE, WOOD, and SHEPHERD, in an argument of considerable length, in which no suggestion was made in favor of supporting the verdict on the ground that the jury had the right to assess exemplary damages; but counsel contended that " where the spirit is prin-

cipally wounded and the future happiness of the sufferer destroyed,"
"damages for such an injury suffered by the husband" must rest in
"the judgment of the jury"—being "incapable of ascertainment by
reference to any known rule." And counsel cited the case of *Wilford*
v. *Berkley, ante.*

ASHURST, J., assenting to this view of the matter, said,—"Where
damages depend in any wise upon calculation, the court have some
medium to direct them by which they are enabled to correct any mis-
take of the jury. But where there is no such light to guide them,
where the damages depend upon mere sentiment and opinion, the court
have no line to go by.

GROSE, J., was of opinion that even if the court had power to inter-
fere, they ought not to do so " for the first time, in a case like the
present, where the adulterer is a married man and has taken away his
friend's wife. If we were to grant a new trial, I should feel myself
greatly at a loss to point out to the jury what line they ought to take."

The whole case goes upon the ground of compensatory damages, de-
pending upon the mere sentiment and opinion of the jury.

If there was any known rule—such as that of punishment and ex-
ample—by which to regulate the assessment of damages, it was not
recognized by Lord KENYON, and Judges ASHURST, BULLER, and GROSE,
who had " no such light to guide them." Lord KENYON, at *Nisi Prius*,
in summing up the evidence, had told the jury that they were to assess
"what damages, under all the circumstances, the plaintiff was en-
titled to."

*Wilford* v. *Berkely*, 1 Burr. 609, A. D. 1758, was an action for
criminal conversation. The court said,—" The injury suffered by the
husband, and the estimate of the damages to be assessed, must, in
their nature, depend entirely upon circumstances."

In a later case of similar character, *James* v. *Biddington*, 6 C. & P.
589, A. D. 1834, another of Mr. Sedgwick's cases, the declaration
in case contained three counts: 1st, For the criminal conversation ;
2d, For harboring the seduced wife ; 3d, Trover, for her wearing ap-
parel.

It was held that evidence of the amount of the defendant's property
was properly rejected at the trial. ALDERSON, B., said,—" In a case of
this kind, a plaintiff is entitled to so much damage as a jury think is a
compensation for the injury he has sustained, and the amount of
the defendant's property is not a question in the cause. In a case
of breach of promise of marriage, the amount of the defendant's prop-
erty is material, as showing what would have been the station of the
plaintiff in society if the defendant had not broken his promise."

We see here, that Baron ALDERSON, less than forty years ago, held
to no such doctrine as exemplary damages in a sense other than as
comprehending compensation, in cases of this character.

*Forde* v. *Skinner*, 4 C. & P. 239, is a case in which damages for
an injury to the plaintiff's feelings were called an "aggravation of
damages," by the defendant's malicious intent to take down a female

pauper's pride by cutting off her hair, being a great injury to her feelings, and ordinarily spoken of as ground of exemplary damages.

*Pearson* v. *Lemaitre*, 5 M. & G. 700, A. D. 1843, is one of the cases always cited to sustain the doctrine of punitive damages; and yet, in that very case, TINDAL, C. J., said (p. 720),—" Upon principle, we think that the *spirit and intention* of the party publishing a libel are fit to be considered by a jury, in estimating *the injury done to the plaintiff.*" He said nothing about punitive or exemplary damages, and, indeed, there is nothing of that character (properly so called) in the case; it is all compensatory for the injury done to the plaintiff, that injury being more or less, according to the " spirit and intention " of the defendant—as in the case of the hat knocked off, which Mr. Justice HEATH so well remembered.

The comparatively recent case of *Emblem* v. *Myers*, decided in 1860, 6 H. & N. 54, forcibly illustrates the ideas which I have endeavored to express.

The head note is, " In an action for wilful negligence, the jury may take into consideration the motives of the defendant, and if the negligence is accompanied with a contempt of the plaintiff's rights and convenience, the jury may give exemplary damages."

The defendant caused his own building to be pulled down in such a reckless manner as to greatly injure the plaintiff's adjoining stable and property therein. The act was accompanied by insolence and contempt of the plaintiff's rights.

WILDE, B., charged the jury that for the defendant's negligence they should give such damages as would be a reasonable compensation for the injury the plaintiff had sustained; but if the defendant acted wilfully, with a high hand, for the purpose of trampling on the plaintiff and driving him out of possession of the stable, they might find exemplary damages.

Here, it is manifest, " the injury the plaintiff had sustained" means the pecuniary injury, the injury to property; and " exemplary damages " means compensation for an injury to the plaintiff's feelings. And the way in which it is expressed illustrates the loose and incorrect language on this point with which the books are filled.

In the course of the argument, POLLOCK, C. B., said that if the defendant did not intend any wrong, the verdict should be limited to " the damages really sustained ; but if the injury was committed in an insolent way, they might take into consideration the motive, and give exemplary damages." Here is the same inaccountable use of language. " The damage really sustained " evidently means the damage to the plaintiff's property; and " exemplary damages " as evidently means damage to the plaintiff's feelings by the defendant's manifested " motive" and " insolent way."

An accurate translation of the terms used into correct legal phraseology, nay, into any diction which shall faithfully and truly express the real meaning and intention of the judges, causes the idea of exemplary damages, in the sense of vindictive damages—the sense in

which they were apparently, but unintentionally, used—to vanish into thin air and utterly disappear.

Is this all a senseless quarrel about words ? Yes, so long as the true meaning is understood and unobscured,—but when the inadvertent and careless use of such language leads to such a misunderstanding as must promote injustice in a given case, and, by adoption as precedent and authority, shall finally ripen into unconstitutional injustice, it is no longer a matter of verbal insignificance, but it becomes a matter of very grave importance. ·

The opinions of the judges in the case last cited present the point of this contention very vividly.

POLLOCK, C. B., says damages may be aggravated by the contemptuous and insolent manner of doing a wrong to property. Certainly. The contemptuous and insolent manner in which the defendant smashed in the plaintiff's stable over his wife, who was inside, and his horse and his cart, might injure the plaintiff's feelings more than the act itself injured his property. And if you choose to call compensation for such an injury done to the plaintiff's feelings by the defendant's contemptuous and insolent act " exemplary damages," no harm results from the misnomer, provided juries and the courts understand that " exemplary damages " *means* compensation for injury to the plaintiff's feelings. The trouble is, such language is persistently misunderstood.

POLLOCK, C. B., also said (furnishing another instance of the looseness of diction which was employed in speaking of damages),—" The courts have always recognized the distinction between giving damages with a liberal and a sparing hand."

And BRAMWELL, B., said " damages might be given for the insult, as well as the actual injury." In other words, the injury inflicted upon the feelings by an insult, is not an actual injury in the legal vocabulary of the court of exchequer.

But of what consequence is it whether damages given for insult and oppression are *called* compensatory or exemplary, liberal or sparing ? Of none, whatever, till fundamental constitutional rights are imperilled and overthrown by a misconception of the meaning of words : then it becomes high time to express ideas in language which cannot be misunderstood.

In *James* v. *Campbell*, 5 C. & P. 372, A. D. 1832, which was trespass for an assault, BOSANQUET, J., told the jury,—" If the defendant struck the plaintiff, the latter is entitled to your verdict, whether it was done intentionally or not. But the intention is material in considering the amount of the damages."

That is the whole of this case. Mr. Sedgwick regards it as authority in support of his doctrine. And Mr. Sedgwick seeks to fortify his position by such a case as *Rogers* v. *Spence*, 13 M. & W. 571, A. D. 1844, which was trespass of an aggravated character, to the disturbance of the possession of an assignee in bankruptcy.

Lord DENMAN, C. J., said no more than this concerning the damages: " Substantial damages may be recovered in respect of the

assignee's right of possession, though no loss or diminution in value of the property may have occurred."

In *Doe* v. *Filliter*, 13 M. & W. 47, A. D. 1844—cited by Mr. Sedgwick—POLLOCK, C. B., said,—" In actions for malicious injuries, juries have been allowed to give what are called vindictive damages, and to take all the circumstances into consideration."

This remark was in reference to the plaintiff's claim to recover, as damages, full costs of a former action, in a subsequent suit ·for vexatiously prosecuting the former action. Full costs were not allowed ; but " the *taxed* costs are a fair *indemnity*," said the chief baron,—ALDERSON, GURNEY, and ROLFE, B. B., concurring.

The principle upon which damages are regulated in cases of seduction has been, as we have seen, sometimes regarded as anomalous and indefinable—*Davidson* v. *Goodhall*, before cited, *ante* p. 345. Mr. Hilliard refers it to the doctrine of " exemplary damages, beyond the mere loss of service and payment of necessary expenses." In the same breath he undertakes to specify these " exemplary damages ; " " and the jury, in assessing damages, may take into view the wounded feelings of the plaintiff, and not only recompense him, but punish the defendant, according to the aggravation of the offence. They may award him compensation for the destruction of his domestic peace, as well as the disgrace cast upon his family." 2 Hilliard on Torts 602. Here, in the compass of a dozen lines, are damages spoken of as exemplary, as compensatory, as punishment, and as a recompense, and all, we submit, meaning *the same* damages.

But the English courts, in comparatively recent times even, were unable to recognize the doctrine of exemplary damages as applicable to this class of cases ; for Lord ELLENBOROUGH said that the action of seduction was " a case *sui generis*, where, in estimating the damages, the *parental feelings*, and the feelings of those who stood *in loco parentis*, had always been taken into consideration ; and although it was difficult to conceive upon what legal principles the damages could be extended ultra the injury arising from loss of service, yet the practice was now inveterate, and could not be shaken." *Irwin* v. *Dearman*, 11 East. 23.

In *Andrews* v. *Askey*, 8 C. & P. 7, A. D. 1837, TINDAL, C. J., said to the jury,—" You are not confined to the consideration of the mere loss of service, but may give some damages for the distress and anxiety of mind which the mother has felt. If you find for the plaintiff, you will take into consideration the situation in life of the parties, and say what you think, under all the circumstances of the case, is a *reasonable compensation* to be given to the mother. And see, to the same effect, *Edmonson* v. *Machell*, 2 Term 4.

Mr. Selwyn (2 Sel. N. P. 1116) says,—" It may be remarked, that although this practice of giving damages for the wounded feelings of the party can scarcely be reconciled with the strict rule of law which entitles a person to recover only *secundum allegata et probata*, yet, when the nature of the vice of seduction and the pernicious conse-

quences which result from it are duly considered, few persons (h
anxious they may be that the boundaries between civil injuries
criminal offences should be preserved as distinct as possible) will r
that such a practice has been adopted.

In *Edgell v. Francis*, 1 M. & G. 222, A. D. 1840, which was an a
tion for trespass and false imprisonment, BOSANQUET, J., said,—" We
must look not only at the fact of the plaintiff's being put into confine
ment, but at the charge on which he was given in custody. A more
grave charge against a party in the plaintiff's situation in life cannot
well be imagined than that which the defendant saw fit to make against
him; and if the jury had given small damages, his character might have
been affected." · And ERSKINE, J., added,—" The question for the jury
was, not what the defendant could afford to pay, but what was a fair
compensation for the injury he had received;" but neither of the
judges, nor the counsel trying to sustain the verdict, said anything
about example or punishment.

In *Williams* v. *Currie*, 1 M. G. & S. 841 (one of the cases relied on by
Mr. Sedgwick), which was a case of aggravated and annoying trespass,
the jury were restricted in their award of damages to *a fair compensa-
tion for the injuries sustained*,—the only warrant for regarding it as a
case sustaining the doctrine of exemplary damages being found in the
remark of CRESWELL, J., that the jury were not necessarily to restrict
themselves to the actual amount of the loss of crops proved by the
witnesses. " In cases of this sort," said the learned judge, " it is not
to be expected that a jury will measure their verdict so nicely as in
cases of contract."

*Clissold* v. *Machel & a.*, 26 U. C. 422, *anno* 30 Vict., in the court of
error and appeal, was an appeal from a judgment in the Queen's
Bench in a case of trespass and false imprisonment.

RICHARD, C. J., said,—" Though the defendants may deserve pun-
ishment, that is no reason why the plaintiffs should reap a reward
beyond a fair indemnity, in consequence of the bad conduct of the
former."

This case manifests the sound sense of the administrators of justice
in the Dominion.

Turning our attention now to a few of the most prominent American
cases, it is worthy of observation that the courts of Massachusetts have
steadily adhered to the doctrine of compensation, as affording the only
true measure of damages.

*Weld* v. *Bartlett*, 10 Mass. 470, A. D. 1813,—one of Mr. Sedgwick's
authorities,—was *case* against a sheriff for the neglect and default of
his deputy, whereby the plaintiff lost the fruits of a judgment recovered
against one Hill.

PARKER, J., said,—" The action is case and for a tort, in which it is
peculiarly the right of the jury to assess the damages; and in which
they are not restricted to any precise sum. They may give more than
the former judgment if they believe the wrong was wilful on the part

officer; for they may and sometimes do add to the amount of the judgment the expenses and costs not taxable in actions against the ưer, by way of damages, 　＊　＊　the great object of the action being restore the plaintiff to what he has lost by means of the misdoings of the officer."

In *Richards* v. *Farnham*, 13 Pick. 451, A. D 1833, SHAW, C. J., held that damages in tort may be awarded for wilful injury to feelings. These damages are not spoken of by the court as other than compensatory; still Mr. Sedgwick affects to derive support from this case; but in the next,—*Barnard* v. *Poor*, 21 Pick. 378, A. D. 1838,—the same eminent chief justice affords him no consolation by holding that "It is immaterial whether the proof establishes gross negligence, or only want of ordinary care. In either case, the plaintiff would be entitled to recover in damages the actual amount of loss sustained, and no more, in the form of vindictive damages or otherwise."

*Austin & ux* v. *Wilson & ux*, 4 Cush. 273, was decided in 1849. Present, SHAW, C. J., and WILDE, DEWEY, METCALF, and FLETCHER, J. J., all concurring. It was a civil action for a libel by the female defendant upon the female plaintiff. On the trial the court instructed the jury that the term "compensation" included a remuneration for all the injury which the plaintiff had sustained, whether a pecuniary loss or an injury to the feelings or reputation; and that, so far as the actual malice of the defendant had a tendency to explain or give more force to the evidence, it might be taken into account for this purpose but no further; and by the term "exemplary" or "punitive" damages was meant such sum as in some cases juries awarded against a defendant as an example to deter others from similar acts, or as a punishment upon him for the act which was the subject of the action.

These definitions were held to be correct; but METCALF, J., said,— "If exemplary, vindictive, or punitory damages are ever recoverable, we are clearly of opinion that they cannot be recovered in an action for an injury which is also punishable by indictment, as libel, and assault and battery. If they could, the defendant might be punished twice for the same act"—citing *Taylor* v. *Carpenter*, 2 W. & M. 1, 22, in which WOODBURY, J. (SPRAGUE, J., expressing his concurrence), referred to 2 Gr. Ev., secs. 266–272, 3 Am. Jur. 287–308, and 19 Pick. 216, as expressing the true doctrine, "under modern analyses and decisions on this point." He says,—"In very corrupt or flagitious wrongs, if a criminal prosecution lies for the public offence, I do not see much justification for what are called vindictive damages there, or smart money in the civil suit, as the criminal one covers them;" and in reference to the charge of the court below he says,—"If here, by *exemplary damages*, the judge meant a full indemnity for the individual wrong in every equitable view, and thus, by example, operating in a preventive manner the more effectually against a repetition of such injuries, then no error happened on his part. So, if he, in the hurry of the trial, used language which the jury were likely to construe as going beyond that range of indemnity, yet, in point of fact the jury did

not give more than was sufficient to make the plaintiff whole, but rather less than that amount, this state of things does not seem to constitute a good ground for a new trial. *Taylor* v. *Carpenter*, 2 Woodb. & M. 1.

*Meagher* v. *Driscoll*, 99 Mass. 281, A. D. 1868, is the latest Massachusetts case on the subject. It was trespass for breaking a burial lot, and removing the dead body of the plaintiff's child. FOSTER, J., expressed the opinion of the court as follows: " He who is guilty of a wilful trespass, or one characterized by gross carelessness or want of ordinary attention to the rights of another, is bound to make full compensation. Under such circumstances, the natural injury to the feelings of the plaintiff may be taken into consideration in trespasses to real estate, as well as in other actions of tort. Acts of gross carelessness, as well as those of wilful mischief, often inflict a serious wound upon the feelings, when the injury done to property is comparatively trifling. We know of no rule of law which requires the mental suffering of the plaintiff, or the misconduct of the defendant, to be disregarded. The damages in such cases are enhanced, not because vindictive or exemplary damages are allowable, but because the mental *injury* is made greater by its wantonness."

There were present, and concurring in the decision of this cause, CHAPMAN, C. J., and HOAR, GRAY, FOSTER, WELLS, and COLT, J. J.

See also, *Stowe* v. *Heywood*, 7 Allen, 123.

The Connecticut cases will be found to exhibit a singular degree of confusion upon the subject, illustrating most clearly the mischief resulting from the incorrect apprehension of the character and meaning of damages, when applied to things spiritual and mental rather than purely material. This confusion and incongruity of ideas is specially exemplified in *Linsley* v. *Bushnell*, 15 Conn. 225, A. D. 1842 (cited by Sedgwick), in which, at *nisi prius*, the court told the jury,—" The law has fixed no definite rule of damages; but the plaintiff is entitled to recover a fair and reasonable *indemnity* for the injuries he has received in his person and health, so far as you can, as reasonable men, *acting without vindictive feelings*, ascertain the amount. In actions of this character, there is no rule of damages fixed by law, as in cases of contract, trover, &c. The object is the *satisfaction* and *remuneration* for a personal injury which is not capable of an exact cash valuation."

This is all well enough; but the court above, not content to let well enough alone, while expressly approving and sustaining the charge, treat it as instruction to the jury that they might award exemplary damages, when (it seems to me quite clear) the judge presiding at the trial had no such intention or notion.

The court above, seemingly unable to conceive of *compensation* otherwise than by the application of such a market value as may be applied to a *material* loss, go on to *enlarge* and *explain*, while they commend, the charge to the jury, as follows: " The circumstances of aggravation or mitigation, the injury to the plaintiff's business and

means of livelihood, past and prospective,—all these and many other circumstances may be taken into consideration by the jury in guiding their discretion in assessing damages for a wanton personal injury."

All this, too, is well enough, for all these considerations affect the plaintiff's actual *compensation*. It was, therefore, quite unnecessary to go on and say,—what the court below found it entirely unnecessary to say, and what was not intended by the trial judge,—"There is no principle better established, and no practice more universal, than that vindictive damages, or smart money, may be, and are, awarded by the verdicts of juries, in cases of wanton and malicious injuries."

This last paragraph illustrates the confusion of ideas which lies at the foundation of the great mass of cases which go to make up the authority, so called, for the imposition of double or treble damages, and a fine upon the top of all, under the denomination of exemplary or vindictive damages.

Therefore it was natural that *Huntley* v. *Bacon*, 15 Conn. 267, should follow, two years later, in the same track. The charge to the jury was, "If you find the trespass complained of was committed maliciously, or in a wanton and aggravated manner, and *with design to injure and vex* the plaintiff, you may render a verdict for such sum as you shall judge to be reasonable and proper under the circumstances."

These instructions were held to be correct (as they clearly were); but the court above must needs invoke for their support the authority of the preceding case, assuming that the court below had instructed the jury that they might give *vindictive* damages, instead of damages *compensatory* of the plaintiff's *vexation*.

In the opinion, by the same judge who delivered the opinion in *Linsley* v. *Bushnell*, is cited *Dennison* v. *Hyde*, 6 Conn. 508, where it is only said (referring to *Nichols* v. *Bronson*, 2 Day 211, *Edwards* v. *Beach*, 3 Day 447, and *Churchill* v. *Watson*, 5 Day 140), "There is no precise rule of damages in actions of this description—trespass *vi et armis:* not only the *direct* damage [as if wanton *vexation* and annoyance were remote or consequential, and *therefore* not compensatory], but the probable or *inevitable* damages, and those which result from the aggravating circumstances *attending the act*, are proper to be estimated by the jury."

The author of the present discourse finds such lucubrations as these both *aggravating* and *vexatious;* and not *remote*, but *consequentially direct*,—demanding *compensation* for the trouble of their consideration.

After such expositions of the law as these, we are scarce prepared for the brightness of the lucid interval which dawns, transiently, upon the Connecticut courts in 1853; and we are quite startled to find that, in *Seger* v. *Buckhamster*, 22 Conn. 290, an action to recover damages sustained by reason of a defective bridge, the judge at *nisi prius* having told the jury they had a right to consider all the circumstances of danger and peril attending the accident, the supreme court (STORRS, J.) say,—"We think this part of the charge was right. * * 'It is not necessary to inquire whether or how far * * vindictive or punitory

damages are allowable. That the plaintiff is entitled to be *compensated* for his actual personal injury, there is, of course, no question; and *that principle* is sufficient to vindicate the charge on this point. Such actual injury is not confined to the wounds and bruises upon his body, but extends to his mental suffering. His mind is no less a part of his person than his body; and the sufferings of the former are oftentimes more acute and also more lasting than those of the latter, * * and to say that [these do] not enter into the character and extent of the *actual* injury and form a part of it, would be an affront to common sense."

Darkness supervenes in a brief period, for, in 1857, the court declare it to be " settled in this state that a jury may give damages beyond a mere compensation, and exemplary or vindictive damages in case of malice or wantonness." *Dibble* v. *Morris*, 26 Conn. 416. And chaos comes again in 1862, when the court declare that " in cases of gross and wilful fraud, a jury are at liberty to give, and the course of our decisions has been to encourage, what are sometimes called vindictive or exemplary damages. The *object intended* in these cases is to give the plaintiff *a full indemnity for his injury.*" *Platt* v. *Brown*, 30 Conn. 336.

The court leave us in the dark as to whether what are " sometimes called " vindictive or exemplary damages are, in their judgment, properly or improperly thus denominated.

We may venture no further in this direction. It were better if we had recognized the " characters in colour dim " inscribed upon the portal of our entrance:

"Lasciate ogni speranza voi ch' entrate."

The doctrine of exemplary damages is undoubtedly recognized in Illinois; but in *Tyndt* v. *Hartranft*, 41 Ill. 10, *Reeder* v. *Purdy*, 48 Ill. 261, and *Farwell* v. *Warner*, 51 Ill. 467, the term " exemplary damages " is clearly used for no other purpose and intention than to express damages beyond the mere pecuniary loss actually sustained, while in the case of *The Railroad* v. *Williams*, 55 Ill. 185, the idea of exemplary damages is expressed as something " in addition to the actual damages for the indignity, vexation, and disgrace to which the party has been subjected;" which is another illustration of the careless and indefinite use of language.

In *Slater* v. *Sherman*, 5 Bush. Ky. 206, the jury having been instructed that " in estimating the damage they are not confined to the actual outlay of money paid by the plaintiff for surgeons' and physicians' bills, or loss of time, but may take into consideration the bodily pain and sufferings and personal disfiguration of the plaintiff as *part of the injury* for which the plaintiff is entitled to *compensation* in damages," it was held that these instructions were correct; but, unfortunately as well as unnecessarily, the court undertook to give reasons for this holding, to this effect: that " a plaintiff may recover vindictive or punitive damages for personal injuries, where the commission

of the act complained of is accompanied with circumstances of aggravation;" which abstract proposition is needless for application, and only serves to show that vindictive, and exemplary damages were there regarded as embracing everything beyond the bare outlay of expenses.

In an earlier case, within the same jurisdiction, SIMPSON, C. J., declares that the right of the plaintiff to recover vindictive damages for personal injuries, where the commission of the act complained of is accompanied with circumstances of aggravation, has been so often recognized by the court that it must be regarded as a settled rule of law in Kentucky.

He then goes on to say,—" This rule, when properly understood, supported by principle, analogy, and authority. The arguments used in opposition to the rule proceed on the erroneous assumption that vindictive damages are inflicted by way of criminal or penal punishment, and are not given by way of compensation for the injury complained of. Such damages may operate by way of punishment, but they are allowed by way of remuneration for the wrong suffered.    *    * Such damages, although given to recompense the sufferer, do inflict a punishment upon the offender.    *    * The damages are allowed as compensation for the loss sustained, but the jury are permitted to give exemplary damages on account of the nature of the injury. It is therefore the increase of the damages resulting from the character of the defendant's conduct that is denominated punitive or vindictive." *Chiles* v. *Drake*, 2 Met. Ky. 146.

This language of Mr. Ch. J. SIMPSON forcibly illustrates the suggestion already made, that it is of no sort of consequence what appellation you bestow upon a rule of damages which is, in fact, compensatory merely, if everybody understands the meaning of the terms employed. That Judge SIMPSON understood the matter very differently from the understanding of Mr. Sedgwick, who cites this case in support of his own views, seems to me quite apparent.

The case of *Ellsworth* v. *Potter*, 41 Vt. 688, furnishes an illustration of the application of the terms " exemplary," " vindictive," and " punitive" damages to such as belong in fact to compensation merely. Such is also the case of *Bonsall* v. *McKay*, 1 Hous. Del. 520, though the doctrine of exemplary damages is fully insisted upon.

In *Bannon* v. *The Baltimore & Ohio Railroad*, 24 Md. 123, A. D. 1865, the court in express terms declines to " adopt or deny    *    * the proposition so elaborately discussed by the learned jurists Sedgwick and Greenleaf."

*Barnet* v. *Reed*, 51 Pa. St. 190, is another instance of the confusion which seems inseparable from the consideration of this matter by the courts. STRONG, J., held that the following instructions were unexceptionable : "Where the malice is only such as results from a groundless act, and there is no *actual* malice or design to injure, the rule is compensatory damages ; but where actual malice exists, a formed design to injure and oppress, the jury may give vindictive damages,—that is, damages to punish the defendant for his fraud and malice. Compen-

satory damages are such as indemnify the plaintiff, including actual loss or injury of property, loss of time and necessary expenses, counsel fees, and any other *actual* loss the plaintiff suffered."

· Observe, here, the narrow and restrictive character of the *actual* damage for which, alone, *compensation* can be made.

Injury to the feelings, in the view of this court, is no *actual* damage ; but for the infliction of the injury the defendant must be punished by paying to the plaintiff damages which he has not sustained.

This was in 1867, but the next year things became sadly mixed ; for in *Carey* v. *Bright*, 58 Pa. St. 70, the following instructions to the jury were held to be correct: " The ordinary rule of damages, in trover, is the value of the property at the time of the conversion, with interest to the date of trial ; although the jury are justifiable in going further where there has been an outrage in the taking, or vexation and oppression in the detention, *as a compensation to the party injured.*"

But in *Pa. & Ohio Canal* v. *Graham*, 63 Pa. St. 290, damages for pain and suffering resulting from tortious negligence are not spoken of as exemplary or vindictive, but are comprehended within "*general* damages."

In *Fox* v. *Stevens*, 13 Min. 272, which was a case for seduction, the jury were instructed that, besides loss of services and the disbursements for medical treatment and other necessary expenses, they could give such additional damages for wounded feelings, mental suffering, and for the dishonor of the plaintiff and his family, as they should deem, from the evidence, to be a reasonable and just *compensation* therefor.

These instructions were approved ; but the court seemed called upon to remark that, in cases of wilful wrongs, it is settled that exemplary damages may be given. This, I suppose, was to show that mental sufferings and dishonor were things too etherial and refined to be capable of sustaining *actual* damage.

In *Bussy* v. *Donaldson*, 4 Dal. 207, case for gross negligence, it is said,—" As to the assessment of damages, it is a rational and a legal principle, that the compensation should be equivalent to the injury. There may be some occasional departures from this principle, but I think it will be found safest to adhere to it in all cases proper for a legal indemnification in the shape of damages."

In *Freidenhart* v. *Edmundson*, 36 Mo. 226, HOLMES, J., said,—"Exemplary damages would seem, in the ordinary and proper sense of the word, such damages as would be a good round compensation and an adequate recompense for the injury sustained, and such as might serve for a wholesome example in other like cases. As we conceive, this does not go beyond the sense of the rule, as laid down by Greenleaf, and certainly comes within the doctrine maintained by Sedgwick. Sedg. Dam. 38, and 453, 454. The jury may give damages beyond the value of the goods for breaking and entering the store, seizing his property, putting his person in danger, breaking up his stock and injuring his business, and greatly annoying and disturbing him. 2 Gr. Ev., sec. 253, and *n.*

" The more unsettled question, and what appears to be the principal thing in dispute between the authors above cited, whether the jury may in any case award merely vindictive and punitory damages by way of punishing the defendant rather than compensating the plaintiff, proceeding on the ground that the general good and interest of society demanded such punishment, does not necessarily arise in this case; and we are not understood as sanctioning a principle which, by the nature of it, would seem to belong rather to the domain of criminal than civil jurisprudence."

In *McKeon* v. *Citizens' Railway Co.*, 42 Mo. 79, the same judge said,—" It is at least very questionable, upon principle and authority, whether damages for punishment can be given in any civil action. My own opinion is, they cannot."

One of the judges dissented, but did not express his views.

*Green* v. *Craig*, 47 Mo. 90, indorses the doctrine of exemplary and punitive punishment to the fullest extent; but there (as in most of the cases), all the damages called exemplary might have been just as well awarded for compensation only.

*Cooke* v. *Ellis*, 6 Hill 466, is cited by Mr. Sedgwick as an authority in favor of exemplary and punitive damages in a case where the offence may also be punished by the criminal law, and the case undoubtedly goes to the full extent of that doctrine ; but, if it is founded upon the authority of such cases as *Jacks* v. *Bell*, 3 C. & P. 316, cited there in support of the decision, it must be confessed that the support is feeble and reluctantly bestowed; for, in *Jacks* v. *Bell*, Lord TENTER-DEN said,—" In this case, there must be a verdict for the plaintiff; but the question will be as to the amount of the damages. These parties have been indicted, and now an action is brought against them. Here is a two-fold proceeding, a double harass and a double vexation for one and the same offence. In actions for assaults, juries do not, in general, confine themselves to damages for the personal injuries sustained. I do not remember any instance in which a party has brought an action after having preferred an indictment and received a portion of the fine. * * You will therefore say, under these circumstances, what damages you think ought to be given to the plaintiff." Verdict, one farthing, followed by a severe reprimand of the plaintiff's attorney.

In *Smithwick* v. *Ward*, 7 Jones's Law (N. C.) 64, the court said,—"We have felt some doubt whether vindicatory damages ought to be given to a party in a civil suit, under any circumstances where the case appears to involve, indubitably, the same principle and object that a punishment by the public does; and it would seem, therefore, more proper to keep them distinct. But the practice of allowing this element of damages has been so long followed in our circuit courts, that we do not think proper to disturb it."

That is to say, it seems to us *improper* to allow such damages in a civil suit; but some of the fathers have eaten sour grapes, and the children's teeth are set on edge ; and we have conducted ourselves improperly for so long a time,—and we have acted improperly because, for

a long time, we misunderstood what we now understand, namely, that we were in error,—that, on the whole, we prefer to trample under foot the sacredest maxims of the common law, rather than sacrifice the pride we feel in our stubborn consistency.

In *Hendrickson* v. *Kingsbury*, 21 Iowa 379, the court, after a long discussion of the subject, and a review of the relative positions of Mr. Sedgwick and Mr. Greenleaf, in which they insist that the controversy between those distinguished jurists is a mere quarrel about words and legal terminology, and, notwithstanding their conclusion in favor of the doctrine of exemplary and punitive damages as maintained by Mr. Sedgwick, do nevertheless admit that there must be some limit to the extent of the punishment by damages in a civil suit ; and therefore they are careful to tell the world that " It must be remembered that the doctrine of giving damages as a punishment for the malicious or oppressive act of the defendant, if they are construed *as punishment*, must be limited to cases were the act done is not punishable by the penal or criminal laws of the state.   For it is a principle of the common law, and one which is embodied in many of the state constitutions, that no person shall be twice punished for the same cause— *nemo bis vexari pro eadem causa.*"   And, alluding to the special instructions in the case before them, the court remark that, "after telling the jury they may compensate the plaintiff, punish the defendant, and protect society, and not scrutinize these amounts very closely, and that they may also add such further sum as will manifest the detestation in which the act is held by them, is, to speak mythologically, ' piling Pelion and Ossa on Olympus.' "

We agree with this criticism ; and it occurs to us that if the same court had been dealing with the instructions in the present case, which go to the same extent, substantially, in a case, such as that was not, where the offence is also punishable by fine under indictment, the fertility of classical illustration would not have failed to summon up the figure of one whose form

> " dilated stood,
> Like Teneriffe or Atlas, unremoved ;
> His stature reached the sky, and on his crest
> Sat horror,"—

that was not quite tall enough, and therefore,—

> " on his crest
> Sat horror, *plumed.*"

The last of the American cases which we shall stop to consider is one of recent date, emanating from a court of high ability—the case of *Detroit Daily Post Co. & a.,* v. *McArthur*, 16 Mich. 447, A. D. 1868.

Among the head notes are these : " While those damages which depend on the sound discretion of a jury are not susceptible of any accurate regulation by the court, yet the jury should be prevented, by

proper caution, from acting upon improper theories as to the legitimate elements to be considered in estimating them.

"The term 'exemplary or vindictive damages' should not be used without such explanation as may prevent a jury from being misled by it. For voluntary wrongs, additional damages are allowed for injured feeling, which must naturally be aggravated or mitigated by the degree of malice actually existing, but nothing beyond the individual grievance should be taken into the account in estimating them."

And refreshing as a well-spring in a desert is the sensible talk of Mr. Justice CAMPBELL, expressing the opinion of the court: "It is in connection with the various degrees of blameworthiness chargeable on wrong-doers that the discussions have arisen on the subject of vindictive or exemplary damages, which, inasmuch as they rest upon actual fault, are by some authorities said to be designed to punish the wrong intent, while, according to others, the damages usually so called are only meant to recompense the sense of injury, which is, in human experience, always aggravated or lessened in proportion to the degree of perversity exhibited by the offender. While the term exemplary or vindictive damages has become so fixed in the law that it may be difficult to get rid of it, yet it should not be allowed to be used so as to mislead; and we think the only proper application of damages, beyond those to person, property, or reputation, is to make reparation for the injury to the feelings of the person injured. This is often the greatest wrong which can be inflicted, and injured pride or affection may, under some circumstances, justify very heavy damages. * * The injury to the feelings is only allowed to be considered in those torts which consist of some voluntary act or very gross neglect, and practically depends very closely on the degree of fault evinced by all the circumstances.

"It has been very wisely left to the jury to determine each case upon its own surroundings, because the only safe rule of damages in matters of feeling is, to give what to the ordinary apprehension of impartial men would seem proportionate to an injury which must be measured by the instincts of our common humanity."

This review of some of the more prominent cases touching the subject under consideration, it seems to me, must compel the conclusion which has been already indicated, that the modern, erroneous idea of exemplary damages originated in, and is, in fact, the same thing as damages for wounded feelings, as distinguished from damages for an injury to person or property.

Damages for lacerated sensibilities, insulted honor, tyrannical oppression, and so forth, being much emphasized, and often being the principal damage suffered by the plaintiff, and language being loosely used and not preserving the true distinction carefully, or intemperately used (as Lord CAMPBELL said of the language of Lord Chief Justice PRATT) in the heat of indignation which judges often felt and could not repress while contemplating an enormous outrage, it finally came to be understood that damages might be given in a civil suit as a pun-

ishment for an offence against the public; an idea that is certainly not plainly declared (as I think I have unmistakably shown) in the *early* cases.

I venture to say that no case will be found, in ancient, nor indeed in modern reports, in which a judge explicitly told a jury that they might, in an action for an assault and battery, give the plaintiff *four* damages, viz.,—1, For loss of property, as for injury to his apparel, loss of labor and time, expenses of surgical assistance, nursing, &c.; 2, For bodily pain; 3, For mental suffering; and 4, For punishment of the defendant's crime.

But a critical examination of the cases will show, as I believe, that this fourth item is, in fact, comprehended in the third, but has grown into and become a separate and additional item by inconsiderate if not intemperate and angry instructions, given to juries when the court was too much incensed by the exhibition of wanton malice, revenge, insult, and oppression, to weigh, with coolness and deliberation, the meaning of language previously used by other judges; instructions prompted by impulses of righteous indignation, swift to administer supposed justice to a guilty defendant, but expressed with too little caution and without pausing to reflect that the court was thus encouraging the jury to give the plaintiff more than he was entitled to,— to give him, in fact, as damages, the avails of a fine imposed for the vindication of the criminal law, and for the sake of public example. The very circumstances of insult and outrage which called for heavy actual damages as compensation for wounded honor, mental pain, and mortified sensibilities, would naturally have no tendency to make the court cautious in charging the jury on that point, and would also have no tendency to discover and correct any error of law, when the indignation of the court was profoundly stirred.

The "intemperate language" of Lord Ch. J. PRATT, in *Huckle* v. *Money*, and the effervescing indignation of Mr. Chief Justice GIBBS, in *Merest* v. *Harvey*, as it seems to me, most clearly illustrate and confirm the justice and truth of these observations.

There is no branch of the law more exposed to the influence of a just and manly and honorable indignation than that which involves the subject of damages for a malicious wrong, nor any branch of the law more liable to be warped and perverted by violent hatred of evil and corrupt motives and deeds.

This influence is manifested in the gradual growth of the modern doctrine of punitive damages. The result is, that the wholesale doctrine of damages for mental pain and wounded feeling, expressed in inconsiderate language vehemently announced, in circumstances and on occasions of judicial anger, irritation, and excitement, has come to be misunderstood and mistaken for the doctrine of punitive damages, when, in fact, it is but a branch of the law of compensatory damages.

Thus, the doctrine of compensation for the plaintiff has become the doctrine of punishment for the defendant, importing into civil suits that punishment which still remains in criminal procedure, and so,

unfairly, as well as unconstitutionally and illegally, punishing an offender twice for the same crime.

The frame and style of our civil writs expresses, as clearly as if they were framed with that particular intention, the whole object and purpose of civil suits.

The wrong of the defendant, being specified in the declaration, is alleged to have been done "to the damage of the plaintiff, as he says, the sum of ———— dollars." "To the damage of the plaintiff;" not to the damage of the public. "To the damage of the plaintiff;" not "against the peace and dignity of the state."

The form expresses the idea of compensation merely.

On the other hand, the idea of punishment is wholly confined to the criminal law, and expressed in its forms of indictments, complaints, and penal actions.

What is a civil remedy but *reparation* for a wrong inflicted, to the injury of the party seeking redress,—compensation for damage sustained by the plaintiff? How could the idea of punishment be deliberately and designedly installed as a doctrine of civil remedies? Is not punishment out of place, irregular, anomalous, exceptional, unjust, unscientific, not to say absurd and ridiculous, when classed among civil remedies? What kind of a civil remedy for the plaintiff is the punishment of the defendant? The idea is wrong. It is a monstrous heresy. It is an unsightly and an unhealthy excrescence, deforming the symmetry of the body of the law.

It germinated, as I have said, in the misconceptions and inadvertences which were born of righteous indignation, and a zealous eagerness to visit justice and punishment for wrong upon a convicted offender, by means of the first judicial process which might happen to bring his sins to light.

When Mr. Justice ABBOTT, in *Sears* v. *Lyons*, A. D. 1818, said the jury " might consider not only the mere pecuniary damage sustained by the plaintiff, but also the intention with which the act was done, whether for insult or injury," he spoke of the defendant's intention to insult the plaintiff. And, for practical purposes, it might be immaterial whether the jury were told that they might consider the defendant's intention to insult the plaintiff, or whether they were told that they might consider the injury to the plaintiff's feelings by the studied insult inflicted by the defendant. The injury to the plaintiff's feelings is the substance of the instruction in either form of language; and for such injury, compensatory damages may be given. The trouble and difficulty and embarrassment arise when such compensatory damages come to be understood and considered as punitive damages; whereas, in truth, they are no more punitive than the amount of actual compensation for the plaintiff's pecuniary loss, resulting from the destruction of his property. And yet this case of *Sears* v. *Lyons* is constantly cited as an authority for vindictive damages, when, in fact, it is neither more nor less than an authority for giving compensatory damages for an injury to the feelings.

Now I venture to say that a vast number of the cases (probably a majority of them) may be explained in the same way. Take the case referred to by Mr. Justice HEATH, in *Merest* v. *Harvey*, where the jury gave £500 for knocking a man's hat off.

If the defendant inadvertently knocked off the plaintiff's hat, or smashed it down over the plaintiff's face, his hat and his face were hurt just as much as if a low villain, or an irate member of parliament, had inflicted the injury by intentionally committing an unprovoked and unjustifiable assault and battery; but in the former case the plaintiff's feelings (call them pride, vanity, sensibilities, delicacy, or what you please) are damaged very little, if at all, whereas, in the latter case, a jury might properly give £5 for the injury to the plaintiff's person and property—that is, his face or his nose, and his hat—and perhaps £495, more or less, according to the aggravation of the circumstances, for the injury to his feelings.

Is it not quite natural that many people should regard the £495 as punitive instead of compensatory? And how natural it would be for that mistake to grow into law, so far as the law consists of authority and precedent! An injury to the feelings a thousand times greater than the mere pecuniary damages which accompanied or caused the injury to the feelings is a matter too refined, it may be feared, for popular comprehension (except, perhaps, in cases touching the honor of a woman); and therefore juries, and quite frequently judges, would understand they were giving punitive when they were really giving no more than compensatory damages.

I venture to affirm that the most patient research will be exhausted in vain in the effort to find the English case in which a judge ever deliberately and intentionally told a British jury, in any form of language, that they might give the plaintiff four kinds of damage, arithmetically arranged as follows:

| | |
|---|---:|
| 1. Damage to the plaintiff's hat, | £1 |
| 2. Damage to his head and face, | 5s. |
| 3. Damage to his feelings, | £100 |
| 4. Punishment of the defendant by way of example, as a protection of the public by enforcement of criminal law in a civil case, | £300 |
| Total amount of verdict, | £401 5s. |

The truth is, this method of compensation is a modern and American invention, resulting from a misunderstanding of the loose and inaccurate forms of expression used in the old English cases.

The imposition of vindictive damages is, by some, supposed to have originated in actions of trespass *vi et armis*, slander, and seduction; which means, that they were first given as damages for mental pain. But "actual" damage, to use the very common word employed in the cases, being

habitually referred to things purely gross and material, an injury to anything mental or spiritual was made good by exemplary damages, so called, which, in fact, were as purely compensatory as the damages given for injuries to material things,—both kinds of damages being compensatory, and nothing more.

If compensation were now understood, as it formerly was, to be made for injuries to material substance only, and exemplary damages were now understood, as they were formerly, to refer to injuries to the spiritual or mental part of the human nature, there would be no trouble or difficulty in the matter; but in progress of time these definitions have changed. Compensatory damages now include injuries to the mental and spiritual part of mankind; and this change of definition leaving nothing for " exemplary damages," as formerly understood, to operate upon and be applied to, by a very natural mistake the term "exemplary " has been supposed to refer to criminal punishment for the sake of public example; an idea that was not included in " exemplary damages," as formerly understood.

What are called exemplary damages may be given in assumpsit, as in the case of a breach of promise of marriage. *Baldy v. Stratton,* 11 Pa. St. 322. Why? Evidently because of the injury to the feelings, the disappointment, mortification, chagrin, loneliness, and mental suffering of many kinds, the aggregation of which, in the language of the law of England, is not an *actual* injury. A broken head is perceptible by the sight and touch, but a broken heart is quite incomprehensible. This English use of language is well enough, if everybody understands its meaning; but some people, misunderstanding it, have erroneously supposed that it meant the object of a civil suit was something more than compensation.

These general remarks apply just as well to a great many American cases emanating from courts of the highest ability and authority; cases so numerous, that an omission to refer to them cannot be regarded as invidious.

But, no matter how numerous the cases, nor how respectable or elevated the tribunals from which they emanate, if they enunciate a doctrine which was planted in and has grown out of blind misunderstanding,—a misconception that, so long as it is indulged, must inevitably be arrayed in opposition to sound principles of law, and the removal of which will leave the element of damage a plain, clear, consistent, and symmetrical branch of the law,—if this fact is recognized, admitted, and understood, the inquiry will be, not how great the array, nor how formidable the aspect, nor how venerable the antiquity of adverse adjudications, but, simply, how long (being finally convinced of our mistake) shall we go on with the infliction of double and treble punishments for a single offence; and how long shall we thus continue to trample on sacred rights, rooted and grounded in the maxims of the common law, and guaranteed by the constitution of our political government?

The case demands a more specific consideration of its aspect in respect of fundamental and constitutional law.

*Nemo debet bis vexari pro una et eadem causa.*

*Nemo debet bis puniri pro uno delicto.*

No person shall be subject, for the same offence, to be twice put in jeopardy of life or limb.   Art. V, Amendments to Const. U. S.

No subject shall be liable to be tried, after an acquittal, for the same crime or offence.   N. H. Bill of Rights, Art. XVI.

These maxims are as old as the common law; and these constitutional provisions are neither more nor less than a solemn recognition of them by the highest legislative authority.

Mr. Broom mentions but one " remarkable exception which formerly existed " to the principle stated and illustrated by these maxims.

This occurred in the proceedings in case of Appeal of Death (see 4 Bl. Com. 312), which might be instituted against a supposed offender after trial and acquittal, and by which punishment for some heinous crime was demanded on account of the particular injury suffered by an individual, rather than for the offence against the public; but this method of prosecution, having attracted the attention of the legislature in the celebrated case of *Ashford* v. *Thornton*, 1 B. & Ald. 405 *(qu. vide)*, was abolished by Stat. 59, Geo. III, c. 46. Broom's Leg. Max. 258.

Blackstone tells us that this private process for the punishment of crimes probably had its origin in those times when a private pecuniary satisfaction, called a *weregild*, was constantly paid to the party injured, or his relations, to expiate enormous crimes—a custom derived to our British ancestors, in common with other northern nations, from the ancient Germans.   Tacitus Man. Ger., c. 21.

These private prosecutions by appeal, so called, and which involved not only cases of homicide, but also of treason and felony, were gradually discontinued, or abolished by statute, though, to some extent, they were still recognized as legal remedies in the days of Blackstone. But they were plainly regarded by that eminent jurist as violative of the fundamental maxims of the law; for he says,—" These appeals may be brought previous to any indictment, and if the appellee be acquitted thereon, he cannot be afterward indicted for the same offence." And, again : " If he hath been found guilty of manslaughter on an indictment, and hath had the benefit of clergy, and suffered the judgment of the law, he cannot afterward be appealed ; for it is a maxim in law, that ' *nemo bis punitur pro eodem delicto.*' "   4 Bl. Com. 312–315.

In trespass, the old process was a capias, and a fine was set in proportion to the degree of the offence, and levied by *capiatur*.   Com. Dig., Action G, 2.   This practice, by which a fine to the king for a breach of the peace was recoverable in the same suit in which the plaintiff sought damages for his personal injury, was never adopted in this country.   And by statute 5 & 6, Wm. III, c. 12, the practice was abolished in England,—that statute having enacted that " *no capias pro fine* shall be prosecuted against the defendant, either in trover, eject-

ment, assault, or false imprisonment." *Lindsey* v. *Clarke*, 5 Mod. 285 ;—see *Morrison* v. *Bedell*, 22 N. H. 234, 244.

Prior to the statute of Wm. III, it is believed no case can be found in which the suggestion of exemplary, punitive, or vindictive damages, or anything about smart money, is contained.

It is possible that the notion of punishing an offender by damages ultra compensation, in a civil suit, may have originated in an effort thus to evade the statute of Wm. III.

The provision of our federal constitution, that no man shall be twice put in jeopardy of life or limb, is by no means to receive such a construction as would permit a man to be twice tried for any offence other than such as is actually punishable by loss of life or limb. At the time of the adoption of the amendment which incorporates this provision, I suppose there was no state in the Union which prescribed any punishment of limb, to guard against which the constitutional provision could have been intended. But the provision was no doubt adopted from ancient English statutes, in which the expression occurred—statutes in practical operation when such punishments were inflicted; for in times anterior to the Norman conquest, most, if not all, felonies were punishable with death, unless redeemed by the *weregild*—1 Hale P. C. 12, note ; and in the time of Wm. I and Wm. II, many felonies were punished by loss of limb. See argument of Emmet, in the *People* v. *Goodwin*, 18 Johns. 187, and cases there cited; but, per Spencer, Ch. J., the expression *jeopardy of limb*, in the constitution, " was used in reference to the nature of the offence, and not to designate the punishment for an offence. Punishment by deprivation of limb would be abhorrent to the feelings and opinions of the enlightened age in which the constitution was adopted. We must understand the term ' jeopardy of limb' as referring to offences which in former ages were punishable by dismemberment, and as intending to comprise the crimes denominated in the law, felonies.

" The question then recurs, What is the meaning of the rule, that no person shall be subject, for the same offence, to be twice put in jeopardy of life or limb? Upon the fullest consideration which I have been able to bestow on the subject, I am satisfied that it means no more than this : that *no man shall be twice tried for the same offence.*"

In *Whitney* v. *Hitchcock*, 4 Den. 461, which was *trespass* for an indecent assault, the court remark,—" The general question, what damages can be recovered by way of punishment in the class of actions where exemplary damages are usually given, is not involved here. It might be difficult to reconcile what has been said in the books with any definite principle, but we do not intend to express any opinion upon that subject in this case. The present suit is brought for the loss of the services of his servant, which the plaintiff says he has sustained in consequence of the injury which the defendant has inflicted upon her. This he is entitled to recover ; and if sickness had followed, he could have claimed to be reimbursed for the expenses attending such

sickness; but we all think he cannot recover beyond his actual loss. The young female can herself maintain an action in which her damages may be assessed ;  *   *   and if the father could likewise recover them in this case, they could be twice claimed in civil actions, and the defendant would also be liable to indictment."

In *Fox* v. *Ohio*, 5 How. 435, McLEAN, J., remarks,—"There is no principle better established by the common law, none more fully recognized in the federal and state constitutions, than that an individual shall not be put in jeopardy twice for the same offence."

This, it is true, applies to the respective governments; but its spirit applies with equal force to a double punishment for the same act by a state and the federal courts.

And Judge STORY says this constitutional prohibition is but a recognition of an old maxim of the common law, and therefore we are to resort to the common law to ascertain its true meaning.   He also refers to another provision of the federal constitution: "No fact once tried by a jury shall be otherwise reëxamined in any court of the United States than according to the rules of the common law."   Art. 7 of the Amendments.

The only modes of making this reëxamination known to the common law are by a writ of error and a new trial.    *United States* v. *Gilbert*, 2 Sum. C. C. 19 ;—and see *Parsons* v. *Bedford*, 3 Pet. 433, 448.

In *U. S.* v. *Gilbert*, Judge STORY is treating of the application of the constitutional provision and of the common law maxim to a capital case, which that was.   He does not, however, indicate that there is any such restriction ; and in *Com.* v. *Purchase*, 2 Pick. 521, at p. 523, PARKER, C. J., says,—"There is no difference, in relation to this question, between felonies which are capital and those which are not. All felonies, whether capital or otherwise, are included in the provision " of the amendment to the constitution.

The learned author of " Legal Maxims" and the " Commentaries on the Common Law" recognizes the identity of these maxims, and the language of our United States constitution, when he says "it is a principle designated by Lord Campbell as a 'sacred maxim,' that *nemo bis vexari debet pro eadem causa*—no man ought to be twice tried *or brought into jeopardy* of his life or *liberty* more than once for the same offence."    Broom's Com. 992.    And Lord Campbell, in *Reg.* v. *Bird*, 2 Denison's Cr. Cas. 222, remarks,—" It is only the ignorant and the presumptuous who would propose that a man should be liable to be again accused, after a judgment regularly given pronouncing him to be innocent."

I presume no one will now contend that the constitutional provision against a second jeopardy is restricted to capital cases.   Jeopardy of limb, if it has any technical meaning, can, at most, be applied to *restraint* of limb, *i. e.*, deprivation of liberty ; for, as we have seen, dismemberment could not have been contemplated, since such a punishment had not existed for ages before, at the common law, except the loss of a hand for striking in the king's courts.

Putting a person on his trial for any offence, the result of the trial for which may subject him to a fine or recognizance, for default of the payment or procurement of which his liberty may be jeopardized, is putting him in jeopardy of limb, that is, of personal 'restraint, of imprisonment.

The word *jeopardy*, in its legal as well as etymological sense, means *danger* or *hazard*.

Therefore, to punish a defendant civilly, by fine, is to violate not only the constitutional immunity, and also the synonymous maxim of the common law, *nemo debet bis puniri*, but also the other maxim (also synonymous), *nemo debet bis vexari pro una et eadem causa*.

These maxims apply both to criminal and civil proceedings.

Said LUSH, J., in *Winsor* v. *The Queen*, Law Rep. 1 Q. B. 289, 325, —" I think it is clear that there is no distinction between the two, as to the applicability of the fundamental rule: whenever it applies, it applies to both. The rule can be illustrated or interpreted by referring to the plea which would raise the defence,—the plea of *autrefois acquit*, or its converse in a criminal case, or a plea of judgment recovered, or its converse in a civil action. The meaning of the maxim, *nemo debet bis vexari*, is, that where the matter has been once litigated and brought to an end by the proceedings having gone on to a termination, the verdict or judgment shall be a bar to a second trial or litigation upon the same matter."

In the same case, BLACKBURN, J., said,—" This rule of law means, that a man shall not be vexed again for the same offence, after a previous decision upon it."

If, then, this constitutional prohibition of a double penalty is indeed nothing more than an affirmation of the general principle of the common law, applicable alike to civil and criminal cases, making a judgment in one action a bar to another action, founded on the same cause, it follows, logically, that punitive damages are a violation of the general principle of the common law as well as of the constitution, unless indeed they shall be subject to this important condition, that they cannot be given when a fine has been previously imposed in a criminal prosecution; and, when they have been given first in a civil suit, then a fine cannot be imposed for the same cause in a criminal prosecution. This would result in a party's entire exemption from such satisfaction as is supposed to be due to the violated peace and dignity of the state in the latter case, and in both cases would seem inevitably to lead to a development in the art and a procedure in the practice of pleading, which, while amusing for its novelty, illustrates to minds regardful of legal simplicity, symmetry, and correctness, the absurdity of the confusion of the doctrine.

Whoever heard, or expects to hear, or hopes to hear of a plea of *autrefois acquit*, or *autrefois convict*, in answer to a civil suit? or the plea of judgment in a civil suit, in abatement of an indictment for crime?

The provision against a double jeopardy is not incorporated into the

constitution of New Hampshire, as it is in the fundamental law of many states of the Union. Why not? Because, in the first place, the provision of our bill of rights is equivalent; secondly, because the maxim of the common law is recognized, independently of any constitutional or statutory provision, as lying at the very foundation of human rights and privileges—a law of nature, and of obvious common sense and common justice.

So, also, the provision, expressly declared in the constitutions of some states, that private property shall not be taken for public use without compensation, is not to be found in our constitution, but it is supplied by construction; for, said RICHARDSON, C. J., in *Bristol* v. *New Chester*, 3 N. H. 535, " natural justice speaks on this point, where our constitution is silent." See Sedgwick on Statutory and Constitutional Law 494.

The constitutional right is merely a reënactment or affirmation of the common law right (probably regarded in England a constitutional right), enforced by plea of *autrefois acquit*, or *autrefois convict*, in bar of a criminal case, and by plea in abatement of the pendency of a former suit in a civil case. Its adoption in the constitution of the United States is evidence of what the common law was. 1 Whart. Cr. Law, sec. 573 (6 ed.); *The King* v. *Mawbry*, 6 Term 638; *The King* v. *Sutton*, 5 B. & Ad. 52; *Com.* v. *Anthes*, 5. Gray 207, 221, 230; 1 Bennett & Heard, L. C. C. (2d ed.) 440, 482, 513, 554, 592, 612; 6 Com. Dig. Pleader R. 17; 1 Saund. Pl. & Ev. 21; 2 Hale P. C., ch. 31, 32; 3 Waterman's Arch. Cr. Pl. & Pr. 111–123; Cooley's Const. Lim. 321; *Latham* v. *The Queen*, 5 Best & Smith, 641; *Parker* v. *Colcord*, 2 N. H. 36; *Bennett* v. *Chase*, 21 N. H. 581, 584; *Gamsby* v. *Ray*, 52 N. H. 513.

The origin of the provision in our bill of rights, that no person shall be liable to be tried after an acquittal for the same crime or offence, is in the fundamental liberties and constitutional rights of Englishmen; and in New Hampshire it is, said PARKER, C. J., in *Pierce* v. *The State*, 13 N. H. 567, " by reason of the constitutional provision that no person shall be tried twice for the same offence."

What, then, is all this immense accumulation of common-law learning and judicial decisions, on the matter of pleas in abatement of former action pending, and pleas in bar of *autrefois acquit*, or *autrefois convict*, but an application of the principle of the English common law, as recognized and guaranteed by our bill of rights?

The authorities to which we have referred, in the discussion of this branch of the case, are conclusive to the effect that,—whether by virtue of the federal constitution, our own bill of rights, or the fundamental maxims of the common law—the " sacred maxims " whereon, as on a rock, our liberties are planted,—this privilege is secured to every American citizen, as firmly as the inalienable rights of life, liberty, or the pursuit of happiness, namely: he shall not be liable to be tried after an acquittal; nor twice vexed; nor twice punished; nor twice tried; nor twice put in jeopardy for the same offence.

Just as firmly is the right secured to him, that in all cases wherein he is charged with conduct such as calls for punishment for the sake of public vengeance or public example (and to him it can make no difference, so long as the blow must fall, whether it comes from the arm of the civil or the criminal law), that he shall be permitted to confront his accusers and their witnesses face to face, and not be tried upon depositions, and that he shall go free unless his guilt is proven beyond a reasonable doubt.

These prerogatives our fathers brought with them from Old England, and when they became independent and free, they did not omit to record them on the magna charta of their new liberties.

How shall these fundamental principles and rights be maintained, and this immunity from a double or a treble punishment for the same offence and from unconstitutional modes of trial secured in cases like the present?

This defendant has committed an assault, to the damage of the plaintiffs. For the injury thus inflicted the defendant must make full reparation to the plaintiffs. He has also, by the same act, broken the public peace. For this he must atone to the criminal law. Now, this is all right and fair. The injured party will thus be fully compensated; the majesty of the state will be vindicated; the wrong-doer will receive his punishment; the public will be admonished by the example.

But the defendant shall not be *twice* punished. If he is made to pay a fine (denominated exemplary, punitory, or vindictive damages, or smart money), besides another sum of money, required of him as damages for the injury sustained by the plaintiffs,—if he is made to pay this aggregate of damages and punishment *to the plaintiffs*,—he has been just as much punished as if he had paid to the state the fine, and to the plaintiffs only that which belongs to them—compensation for their injuries. The punishment is the same to the offender, neither more nor less; the smart is neither more nor less sharp, whether the punishment enures to the benefit of an individual or of the public.

If, then, he has paid to the plaintiffs, both compensatory damages and a fine by way of punishment, called exemplary damages, and he shall afterward be indicted for the same offence, how shall he escape a double punishment?

Suppose he had been indicted prior to the bringing of this action, had been convicted, and paid his fine to the state: if the instructions to the jury in this case are sustained, how shall he escape a double punishment?

The test by which to decide whether a person has been once tried is familiar to every lawyer. It is a test by the ordeal of pleading. In a criminal prosecution, it can only be applied by a plea of *autrefois convict*, or a plea of *autrefois acquit—The People* v. *Goodwin*, before cited. In a civil prosecution, it can only be by a plea of former recovery in bar, or by a plea of another action pending, in abatement. These pleadings, these tests, are all parts of the common-law right, guaranteed

by the constitution, that a man shall not be twice punished for the same offence.

But no plea of *autrefois convict,* or its converse, can be pleaded in bar of a civil suit; nor can a plea of former judgment be received in abatement of an indictment.

I am aware of but one case in the annals of American jurisprudence *(Pendleton* v. *Davis,* 1 Jones 98) in which this test of pleading has been entirely disregarded, and the principle distinctly recognized and solemnly declared that a man may be punished *three times* for the same offence. To this eminently distinguished case further reference will be made hereafter.

Now, if the present case is within the principle of the bill of rights, or if, independent of that provision, the fundamental maxims of the common law are to be recognized in this state, there is only one course of procedure that can be adopted;—that course is plain, straight, logical, lawful, and constitutional. Since the state cannot be defeated on an indictment by plea of a judgment recovered by these plaintiffs, the only method of enforcing the principle is to refuse in this suit to impose a fine as a penalty for the crime; which fine the plaintiffs are not entitled to, which they do not ask for in their writ, and which may have been or may hereafter be imposed in a prosecution by indictment for the same offence.

Almost innumerable practical difficulties must be encountered, involving absurdities disgraceful to the administration of the science of law, destructive of the established rules of pleading, and in utter contempt of constitutional rights and time-honored principles of justice, in the attempt to evade, conceal, or harmonize the incongruities resulting from an effort to recover damages in a civil action for tort, beyond and distinct from compensation to the fullest extent for all the injury which a plaintiff has sustained.

Every principle and rule of pleading is violated, to begin with. In the first place, the plaintiff is awarded what he does not ask for in his writ. In the next place, the defendant is forbidden to aver, by any pleadings, that he has once paid, or been absolved from the payment, to the state, of that which the plaintiff has received without asking for it. In the third place, the defendant is not only placed in jeopardy of a double punishment for the same offence, but is punished criminally in a civil suit, upon a declaration neither sworn to nor presented by the grand jury.

Then, again, as we have seen, the elementary rules of evidence are disregarded or completely demolished. The defendant may be compelled, in the civil suit, to testify against himself, in a case in which, upon his own testimony, he may be punished as a criminal.

He may have depositions read against him, and thus be deprived of his constitutional right to meet the witnesses face to face.

He may be convicted of, and punished for, a criminal offence upon

the mère balance of evidence, although the jury may entertain a reasonable doubt of his guilt.

Again : the constitutional right of exemption from punishment, after a pardon by the executive, is violated by the imposition of punitive damages. The pardoning power being a constitutional power (N. H. Const., Art. LII), the exemption of the pardoned criminal is a constitutional exemption. But by the imposition of a fine in a civil action the executive pardon and remission of the fine is ignored.

Suppose this defendant shall hereafter be indicted for the offence which is the subject of this suit: of what avail will it be that he shall plead a judgment, rendered on this verdict, for exemplary damages?

Suppose, in this case, as to the plaintiff's claim for damages, he had pleaded, as to any damages beyond compensation for the injury to the plaintiffs, a former acquittal or conviction on an indictment, and sentence performed by imprisonment, or a pardon for the offence, and not guilty as to the residue, as, under the authority of 11 Pick. 134, he might: in such a case could this verdict stand?

Suppose, in this case, there shall be judgment rendered on the verdict for the full amount, and, being in jail on execution, the defendant shall pay the amount of the special sum awarded by the jury for actual damages, and all the costs, and shall then receive a pardon from the governor and council, and bring *habeas corpus :* what then?

These questions are very easily propounded ; but how to deal with them when they become actual and not abstract propositions, is a matter, I apprehend, of some difficulty.

But another question, I fear, is quite too formidable for solution, namely, Where shall be the limit to the confusion and absurdity involved in the attempt to reconcile the doctrine of vindictive and punitive damages, in a civil suit, with the sense, the reason, the logic, the symmetry of the science of jurisprudence? and what power can avail to stay the utter demolition of the constitutional safeguards placed around the people to protect them from the arbitrary despotism which would impose upon them cruel, unjust, and oppressively accumulated punishments?

A few and only a few of the difficulties and practical absurdities, to which allusion has been made as resulting or liable to result from the enforcement of this doctrine for which the plaintiffs contend, are indicated by PERLEY, C. J., in the case somewhat analogous to the present, of *Morrison* v. *Bedell*, 22 N. H. 234, in which the plaintiff undertook, in an action of trespass, to recover the statutory penalty for cutting trees. Said PERLEY, C. J.,—" The form of action is suited to the nature of the claim. * * Debt is the proper remedy to recover a forfeiture, though the wrongful act be forcible in its character and a trespass at common law. * * It might, doubtless, sometimes suit the views of a plaintiff to sue, and in the same action include a claim for these forfeitures. In that way, he might perhaps try his chance for a large amount in the shape of the statutory penalty, without increasing his risk in the prosecution of his demand for the actual

damages he had sustained. But the inconvenience and embarrassment of the defendant would be at least in equal proportion. He would be compelled to defend himself in the same suit against two separate charges for the same act, and these charges different in their natures, and followed by far different consequences; and, besides, the statute provides in the demand for the forfeiture a special mode of trial by proof not admissible in the other charge. The two claims are founded on the same wrongful act. How can they be conveniently or fairly tried together, when the evidence, which the statute has made competent to charge the defendant with the forfeiture, is incompetent and illegal on general principles to prove the same act in the other cause of action. * * Some of the inconveniences that would attend the trial of a claim for these penalties in the same suit, with a demand at common law, would be,—One demand would be of a civil and the other of a criminal nature. The statute provides for a peculiar mode of trial in a suit for the penalty, and allows evidence which would be incompetent in a trial. of the other demand; the limitation of the two causes of action is different, which, to be sure, is not of itself decisive, but tends still further to complicate the case. And the judgment would also be of different effect," etc.

We have the high authority of Comyn's Digest for the general rule, that an action on a statute cannot be joined with a suit at common law. Now, suppose the legislature should enact a law, that actions on statutes might be joined with a suit at common law, and that a claim to recover a statutory penalty might be joined with a count in trespass, or recovered in such an action without joining it or asking for it, the inconveniences, embarrassments, and absurdities suggested by Judge Perley would soon become intolerable; and yet, such a law, probably, would not be unconstitutional. But suppose the legislature should, by a general law, abolish the doctrine of former acquittal and former conviction, and enact in terms that a man may be twice put in jeopardy for the same offence, or as often as a grand jury may find a bill, or a complainant swear to a complaint, and that a man may be repeatedly vexed for the same cause, and twice or thrice punished for the same fault: would such an act, the practical operation of which is illustrated by the proceedings in the case before us, be deemed constitutional?

Probably not; but its invalidity would not result from express constitutional prohibition, any more than the undoubted invalidity of a law prescribing that private property may be taken for public use without compensation to the owner.

No condition is imposed upon the right of eminent domain by our state constitution; but, nevertheless, the right to compensation for property taken under such authority is secured to the citizen by the principles of natural justice, which, it is said, is ever " the universal common law of mankind." Potter's Dwarris on Statutes 371 ;. Cooley's Const. Lim. 559 ; *Bristol* v. *New Chester*, 3 N. H. 535.

The truth is, this fundamental view has been overlooked in a vast majority of the cases in which the doctrine of exemplary damages has been declared; and, if the view is sound, the precedents are not; but every adjudged case to which the constitutional objection is applicable, and in which it has been overlooked or disregarded, involves its own elements of self-annihilation, and has no vital authority.

In several instances, courts in England and America, oppressed by a sense of the injustice and wrong resulting from double punishment for a single offence, have endeavored to point out a means of doing substantial or comparative justice, by seeking to apportion the fine and punishment which the offender has incurred, between the individual personally injured and the public; thus, as the popular phrase is, "blending together the interests of society and the individual." It must be quite difficult to *talk* rationally or logically in this direction; but to apply the test of practical experiment,—*hic opus, hoc labor est.*

Here is an example of this kind of talk: One Davis having assaulted Mr. Pendleton in the court-house, and in the presence of the court, Mr. Pendleton sued Mr. Davis for the trespass, and recovered a verdict for "$100 *actual* and $1000 exemplary damages." On motion to set aside the verdict, it was urged that the circumstance that the blow was given in the presence of the court should not have been left to the jury, because the defendant was liable to be fined for that as a contempt; and it was said, if the jury could take that into consideration he would be punished twice for the same thing.

But, *per curiam,* "Upon the same ground it might be insisted that a jury could not give exemplary damages when the defendant was liable to an indictment; yet it is well-settled law, that a jury may give exemplary damages in such cases.

"No doubt the court, in imposing the fine, would take into consideration the fact that exemplary damages had been recovered." *Pendleton v. Davis,* 1 Jones 98.

"No doubt" this is all sheer nonsense. No doubt Davis deserves punishment; and he is liable and quite likely to obtain his full deserts in the shape of *three* punishments for the same offence.

*Pendleton* v. *Davis* is bad enough as we have it, but it might have been worse; and the next case of the same kind is quite likely to be,— namely, of this character: instead of rendering a divided verdict, the jury find for the plaintiff the round sum of one thousand dollars damages, which Mr. Davis pays.

But even before suit brought against him, and on the instant occasion of the assault, the court fined Davis $50 for contempt, which he paid. When the court imposed that fine, did they take into consideration the fact that a suit for an assault, with a claim for exemplary damages, was impending?

When the jury awarded $1000 to the plaintiff, how much of that sum was exemplary and punitive, how much compensatory damage? How does anybody know? How is anybody to find out?

Did the jury consider that the defendant had paid a fine of $50 to

the county, and so award the plaintiff $50 less on that account? Who can tell, or how can any one tell?

Did the jury *know* that Davis had been fined for the contempt? How did they find that out? Did the court at *nisi prius* entertain the plea of *autrefois convict* for the contempt, or was the fact in some way disclosed by the evidence?

Now, when Mr. Davis has satisfied the plaintiff's execution, no doubt he has been punished twice, very fully and without apportionment.

And, in the fulness of time, Mr. Davis is indicted by the grand jury for this same offence. Will the court in North Carolina permit him to plead Mr. Pendleton's judgment in bar? Probably not, even if it could have been averred what proportion of the gross sum had been awarded for punishment and how much for compensation. Will the court take judicial notice that there ever was any civil suit against the defendant growing out of this matter? Will they receive evidence of the fact?

Suppose the maximum penalty for the offence at criminal law is a fine of $100, and the court in *some way* find out that Mr. Pendleton has recovered $1000, a portion of which is for punitive damages: how are they to know whether the jury awarded $100 or $500 or $5 as exemplary damages? If they do not know, and cannot find out, " no doubt the court in imposing the fine " will fail of accomplishing any very useful result by " taking into consideration the fact that exemplary damages have been recovered."

And finally, Mr. Davis graduates from this school of adversity a sadder and a wiser man, no doubt, but in the same condition of mind with which he entered upon his experience of "unmerciful disaster"— still harboring contempt of court.

When it is asserted, as it has been, that "the true principle is that judgments in both the civil and criminal courts should operate as mutual checks upon each other, thereby increasing or diminishing the punishment in either suit," it is said much too hastily; and if only a little more reflection and consideration had been given the matter, it would not have been said at all. See Amer. Law Rev. for Jan., 1873, pp. 366–368. Such a theory is altogether too fanciful, visionary, and impracticable.

The very recent case of *Wells v. Abrahams*, L. R. 7, Q. B. 554, is an admirable illustration of this. It was an action of trover and trespass for a brooch. Verdict for the plaintiff. A rule for a new trial having been obtained on the ground that it appeared from the evidence that the brooch was taken by the defendant in such circumstances as to prove a charge of felony, and that the judge ought therefore to have nonsuited the plaintiff, it was held that the judge was bound to try the issues upon the record, and that he was right in not having nonsuited the plaintiff.

But, pending the contention, the defendant produced an affidavit, showing that since the verdict the plaintiff had instituted criminal pro-

ceedings against the defendant for the larceny of the brooch; and this fact created great embarrassment, as will be seen from the elaborate arguments and several opinions of the court, as reported.

It seemed to be conceded that the plaintiff *ought not* to have maintained his civil action, if he was contemplating further proceedings under the criminal law—but he had done it; the defendant had not moved for a nonsuit, the plaintiff had gotten his verdict, and now the defendant proposed to show that, because he was a thief, and liable to be punished as such, therefore the plaintiff ought not to have had a judgment against him.

LUSH, J., said that in *Lutterell* v. *Regnell*, 1 Mod. 282, it had been expressly decided that a defendant could not, by way of plea, set up his own turpitude, and say that he had been guilty of a felony in answer to an action for trespass.

And the Lord Chief Justice was well-nigh overwhelmed with the novelty and difficulty of the situation, saying,—" No doubt it has been long established as the law of England, that, where an injury amounts to an infringement of the civil rights of an individual, and at the same time to a felonious wrong, the civil remedy, that is, the right of redress by action, is suspended until the party inflicting the injury has been prosecuted. But, although that is the rule, *it becomes a different question when we have to consider how it is to be enforced.*

" It may be that the person against whom a prosecution for felony is ending may have a right in an action to show by plea that he is in the position of a felon, and so he may be able to stop the action brought by the person injured by his felonious act, although I think this is open to doubt, because the effect would be to allow a party to set up his own criminality. But it may very well be, that, if an action were brought against a person who was either in the course of being prosecuted for felony, or was liable to be prosecuted for felony, the summary jurisdiction of this court might be invoked to stay the proceedings, which would involve an undue use, probably an abuse of the process of this court, in which case the court is always willing to interfere to prevent such abuse. It may be—I do not say it is so—that if a person, neglecting his duty to prosecute for an offence committed against him, were to bring an action instead of prosecuting, the court might be called upon to intervene, and to prevent the plaintiff obtaining by judgment and execution the fruits of the action thus improperly brought; but it is unnecessary now to consider in what way this rule of law might be enforced."

BLACKBURN, LUSH, and QUAIN, J. J., severally encountered and grappled with the difficulty, but after long struggle and contention, the conclusion of their discussion culminated in such despairing declarations as,—" I am not prepared to say so and so;" "I cannot find any case to this effect;" "I do not see how a plaintiff can be prevented from trying his action;" "I know of no instance in which the court has interfered, but I apprehend *it* might do so;" "I do not very clearly see" this or that; "I am at a loss to find any case" similar;

"I do not see how the judge at *nisi prius* could stay proceedings," etc., etc., etc.

And so, at last accounts, the court of Queen's Bench was still sitting hopelessly involved in the meshes of what Mr. Justice QUAIN declared to be "utterly inconsistent positions."

Now, why all this unnecessary trouble, confusion, and perplexity, when the course of procedure should be plain, straight, and uninterrupted? The true rule, simple and just, is to keep the civil and the criminal process and practice distinct and separate. Let the criminal law deal with the criminal, and administer punishment for the legitimate purpose and end of punishment,—namely, the reformation of the offender and the safety of the people. Let the individual, whose rights are infringed and who has suffered injury, go to the civil courts and there obtain full and ample reparation and compensation; but let him not thus obtain the "fruits" to which he is not entitled, and which belong to others.

Why longer tolerate a false doctrine, which, in its practical exemplification, deprives a defendant of his constitutional right of indictment or complaint on oath before being called into court? deprives him of the right of meeting the witnesses against him face to face? deprives him of the right of not being compelled to testify against himself? deprives him of the right of being acquitted, unless the proof of his offence is established beyond all reasonable doubt? deprives him of the right of not being punished twice for the same offence?

Punitive damages destroy every constitutional safeguard within their reach. And what is to be gained by this annihilation and obliteration of fundamental law? The sole object, in its practical results, seems to be, to give a plaintiff something which he does not claim in his declaration. If justice to the plaintiff required the destruction of the constitution, there would be some pretext for wishing the constitution were destroyed. But why demolish the plainest guaranties of that instrument, and explode the very foundation upon which constitutional guaranties are based, for no other purpose than to perpetuate false theories and develop unwholesome fruits?

Undoubtedly this pernicious doctrine "has become so fixed in the law," to repeat the language of Mr. Justice CAMPBELL of Michigan, "that it may be *difficult* to get rid of it." But it is the business of courts to deal with difficulties; and this heresy should be taken in hand without favor, firmly and fearlessly.

It was once said, "If thy right eye offend thee, pluck it out; * * and if thy right hand offend thee, cut it off." Wherefore, not reluctantly should we apply the knife to this deformity, concerning which every true member of the sound and healthy body of the law may well exclaim,—"I have no need of thee."

As to so much of the verdict as relates to the exemplary or vindictive damages, it must be set aside, and there must be

*Judgment on the verdict for no more than $150.*